EDGEWATER GROWTH CAPITAL PARTNERS LP and Edgewater Private Equity Fund III LP, Plaintiffs,

v.

H.I.G. CAPITAL, INC., Bayside Capital LLC, Paloma Value Holding, LLC, Colorado Commercial Finance LLC, Midwest ATM Funding LLC, Pendum Acquisition, Inc., Pendum LLC, John Bolduc, Sean Ozbolt, Dennis Simon, Alexander Stevenson, Christopher Davino, J.G. Ball, and Mark Hoppe, Defendants.

Colorado Commercial Finance LLC, Defendant–Counterclaim Plaintiff,

v.

Edgewater Growth Capital Partners LP, Plaintiff–Counterclaim Defendant.

C.A. No. 3601–CS.

Court of Chancery of Delaware.

Submitted: Dec. 6, 2012.
Decided: Feb. 28, 2013.
Revised: April 18, 2013.

Peter B. Ladig, Esquire, Morris James LLP, Wilmington Delaware, Margo Wolf O'Donnell, Esquire, M. Derek Zolner, Esquire, Vedder Price P.C., Chicago, Illinois, Attorneys for Plaintiff–Counterclaim Defendant Edgewater Growth Capital Partners LP and Plaintiff Edgewater Private Equity Fund III LP.

Peter J. Walsh, Esquire, Jeremy W. Ryan, Esquire, Daniel A. Mason, Esquire, Ryan T. Costa, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware, Attorneys for Defendants H.I.G. Capital, Inc., Bayside Capital LLC, Paloma Value Holding, LCC, Midwest ATM Funding LLC, Pendum Acquisition, Inc., Pendum LLC, John Bolduc, Sean Ozbolt, Dennis Simon, Alexander Stevenson, Christopher Davino, J.G. Ball, and Mark Hoppe and Defendant–Counterclaim Plaintiff Colorado Commercial Finance LLC.

## OPINION

STRINE, Chancellor:

### I. *Introduction*

An ambitious private equity firm, Edgewater Growth Capital Partners LP ("Edgewater"), invested in several businesses that were involved in providing services to companies operating automated teller machines and put them together in one company called "Pendum." Edgewater wrote a relatively small equity check and saddled the acquired company with the obligation to pay back a heavy load of acquisition debt.

Edgewater's ambitions exceeded its ability to integrate the businesses, develop a clear managerial chain of command, and execute an effective business plan. Soon after the merger, Pendum began to fail to comply with the covenants it made to its

creditors. Edgewater, on behalf of Pendum, negotiated a series of extensions and other accommodations after Pendum defaulted under the agreements it had with its creditors, but the creditors eventually demanded that Edgewater propose a strategic restructuring or other permanent solution to the company's inability to function profitably.

Edgewater looked at options, but failed to propose a solvent path forward. Edgewater considered selling the business but the company was in such poor condition that it could not survive buyers' due diligence and the company's accountants could not give an unqualified going concern opinion. Edgewater itself was unwilling to put up the money to pay off the senior lenders and assume the risks of the business going forward.

Eventually, a majority of the senior debt was purchased by affiliates of H.I.G. Capital, Inc. (collectively, "HIG") and the senior lenders refused to allow Edgewater to remain in control of Pendum unless it refinanced the debt. Edgewater did not do so, its directors resigned, and Edgewater used its voting power to seat four new directors associated with an experienced restructuring firm identified by the senior creditors.

Edgewater had taken the lead in dealing with Pendum's creditors. In that capacity, Edgewater had caused Pendum to give its senior creditors the contractual right to foreclose on the company's assets in 10 days upon default. By the time HIG acquired a majority of the senior debt, Pendum had been in and out of default for a lengthy period of time and was insolvent. Believing—as did Edgewater itself—that a bankruptcy was not in anyone's interest, the board of Pendum negotiated a foreclosure sale agreement with HIG to enable Pendum to hold an auction for its assets after a market check, giving Edgewater, and other stakeholders, a much longer period than 10 days to organize a bid for the company's assets. That market check did not land a buyer and Pendum was sold at an open auction by HIG. Pendum Acquisition Inc. ("Pendum Acquisition"), an affiliate of HIG, made the only bid for the assets at the auction.

Edgewater now complains that the sale process was commercially unreasonable and thus a violation of the Uniform Commercial Code. Its motivation for doing so, I find, is principally to avoid paying on a guaranty of about $4 million it made to Pendum's lenders. But it will have to do so because the sale is upheld as commercially reasonable for the reasons that follow.

Pendum had been insolvent under Edgewater's managerial control, unable to pay its bills, and thus any sales process had to be conducted in a time frame that recognized that economic reality. Edgewater's claim that the company was not sold in a commercially reasonable manner is without merit because:

- Edgewater brags that it can do deals of any size, but did not bid for Pendum's assets despite multiple chances to do so;

- The contemporaneous evidence indicates that Edgewater itself did not believe Pendum had a value above what was paid;

- Another major creditor of Pendum, Allied Capital ("Allied"), was also given every chance to make a bid but never did;

- The Pendum board engaged a qualified investment bank to market the company aggressively, and obtained financing from HIG to keep the company paying its bills during the marketing period;

- The banker contacted numerous possible bidders, and signed up confidential agreements giving potential buyers non-public information;

- None of these parties made a contractually binding offer or even expressed a serious interest in negotiating toward that end;

- All of those possible buyers, including Edgewater and Allied, were invited to the actual auction; and

- None of those parties made a bid.

Edgewater has not identified one logical buyer who was not given a chance to buy Pendum, and its own actions in refraining to invest more or to pay off the senior debt speak to the more likely reason why no one outbid HIG: as of the time Edgewater ceded control of Pendum, it was insolvent, an operational mess, and thus an unattractive business to purchase.

Therefore, I reject Edgewater's UCC claim and its other similar attacks on the sale process. And, because Edgewater's claims are primarily motivated by its desire to avoid its $4 million guaranty, Edgewater is contractually obligated to pay HIG's attorneys' fees, costs, and expenses in defending against Edgewater's claims, all of which were necessary to its efforts to secure payment on the guaranty.

## II. *Basic Background*

An overview of some the facts leading up to the sale of Pendum's assets is perhaps useful because it illustrates Pendum's financial condition when HIG decided to foreclose on the company's assets. But many of the material facts in this case will be discussed in the context-based commercial reasonableness analysis required by the Uniform Commercial Code.

This dispute has its origins in Edgewater's plan to put together a business that would provide diverse services to companies operating ATMs. Edgewater made an equity investment in Bantek West Inc. ("Bantek"), which provided armored cash delivery services to the owners of ATMs.[1] Edgewater then caused Bantek to acquire and merge with an ATM repair and servicing company, Efmark Premium Armored ("Efmark").[2] The resulting company was known as Pendum.[3] Under Pendum's Stockholders' Agreement, Edgewater had the right to and did designate a majority of Pendum's directors.[4] Dave Tolmie, who was principally responsible for managing Edgewater's investment in Pendum, was Pendum's first Chairman of the Board.[5] Mark Hoppe, Efmark's founder, had a large continuing equity investment in Pendum and also stayed on after the merger as a director.[6]

Edgewater chose to finance the merger mainly with debt, and thus Edgewater caused Pendum to become heavily leveraged.[7] Under the Amended and Restated Credit Agreement (the "Credit Agreement"), Pendum borrowed about $70 million in senior debt from a syndicate of lenders (Wells Fargo, Greenwich Street Capital, Merrill Lynch Capital, GE Capital, LaSalle Bank, and Callidus Debt Part-

---

1. Tr. 778:11–783:4 (Tolmie) (explaining Edgewater's investment thesis).

2. *Id.* at 798:11–799:24.

3. Pre–Tr. Stip. at 3.

4. JX 13 § 2.3(a) (Pendum's Stockholders' Agreement) ("Edgewater shall have the right to designate four (4) directors....").

5. Tr. 885:18–20 (Tolmie–Cross).

6. Tr. 8:13–18 (Hoppe).

7. Tr. 788:24–789:5 (Tolmie) (explaining that Edgewater made a relatively small equity investment and brought in third-party debt).

ners) and millions more in subordinate debt from Dymas Capital.[8] As a condition for these loans, Tolmie, on behalf of Pendum, agreed to a series of financial milestones.[9] The financial milestones set minimum EBITDA requirements that Pendum had to achieve by certain dates in order to avoid triggering an event of default under the Credit Agreement.[10] In addition, under the Amended and Restated Security Agreement (the "Security Agreement"), Tolmie agreed to give Pendum's lenders a security interest in Pendum's assets.[11] Thus, if Pendum triggered an event of default, the lenders had the contractual right to foreclose on and sell Pendum's assets in 10 days subject to the other legal requirements of the Uniform Commercial Code.[12]

Edgewater was unable to integrate the businesses effectively. The merger of the companies was a disaster because Edgewater failed to establish a clear leadership structure for the combined operations.[13] Pendum's operations became disorganized, which caused the company to be less prof-

itable after the merger when compared to the combined performance of the individual companies before the merger.[14]

In February 2006, just a month after the merger, Pendum triggered its first event of default by not meeting the minimum EBITDA requirement under the Credit Agreement. Edgewater, on behalf of Pendum, helped the company negotiate the First Amendment and Waiver to the Credit Agreement ("First Amendment") to excuse the event of default.[15] The temporary relief provided for by the First Amendment was short lived. Pendum failed to achieve the second financial milestone under the Credit Agreement and Edgewater, on behalf of Pendum, successfully negotiated for a Second Amendment and Waiver to the Credit Agreement on April 1, 2006.[16] But by July 2006, Edgewater failed to make any progress on turning around Pendum's financial nosedive, and Pendum triggered its third event of default.[17] Edgewater realized that it had dug itself into a hole, and that even if the financial condition of the company im-

8. *See* JX 15 (Amended and Restated Credit Agreement) [hereinafter Credit Agreement]; JX 16 (Intercreditor Agreement); Pre–Tr. Stip. at 3–4; Tr. 791:17–24 (Tolmie).

9. Credit Agreement § 6.16.

10. *Id.* §§ 6.16, 7.12.

11. JX 14 (Amended and Restated Security Agreement) [hereinafter Security Agreement].

12. *Id.* § 16.

13. *See* JX 30 (email from PRTM Management Consulting) (explaining that a "key mistake" in the integration of the companies was the leadership model). Another consultant hired by Pendum just a few months later also provided the company with similar feedback, noting that "[n]o-one knows what is going on . . . who is in charge, what the state of the world is etc." and that "[o]bviously, the integration, in general has not proceeded well[,][m]ostly because of a lack of willingness to brea[k]

some eggs, make decisions, set the vision, and then hold people accountable." JX 33.

14. JX 244 (ATM Acquisition Monthly Performance Analysis Ending Dec. 31, 2007); Tr. 19:4–21:4 (Hoppe).

15. JX 20 (Waiver, Consent and First Amendment to Amended and Restated Credit Agreement); Tr. 890:18–21 (Tolmie–Cross) (Q: "Okay. Now, it's true, isn't it, by late February, the first event of default had occurred under the credit agreement; right?" A: "I believe that's correct, yes.").

16. JX 21 (Waiver, Consent and Second Amendment to Amended and Restated Credit Agreement); Tr. 891:8–10 (Tolmie–Cross) (Q: "And a couple months after [the first] waiver, further events of default occurred; correct?" A: "Yes.").

17. Tr. 892:7–18 (Tolmie–Cross).

proved, it still might not meet the financial requirements under the Credit Agreement, because it was already so far behind schedule. Thus, Edgewater sought an amendment to the Credit Agreement that would lower the minimum EBITDA requirements in addition to waiving another event of default.[18]

Dymas Capital began to lose faith in Edgewater's management of the merger. In negotiations over a third waiver of default, Dymas became more "aggressive."[19] Because Edgewater realized that Dymas was "going to be tough ... to deal with" going forward, Edgewater decided to bring in a more friendly subordinate lender.[20] Edgewater contacted Allied, a major player in the subordinate debt markets with a private equity arm of its own, about buying Pendum's subordinate debt.[21] Dymas was more than happy to sell and Allied bought out Dymas.

After Edgewater found itself a more agreeable subordinate lender, Edgewater, on behalf of Pendum, signed up the Third Amendment and Waiver to the Credit Agreement ("Third Amendment") that provided relief in the form of revised EBITDA requirements. The senior lenders agreed to provide Edgewater with the financial relief it sought because two of Pendum's largest shareholders, Edgewater and Mark Hoppe, agreed to support the senior debt. As a condition of the Third

Amendment, Edgewater guaranteed about $4 million of the senior debt and Mark Hoppe posted a letter of credit in support of the senior debt in the amount of $1.2 million.[22]

Even after the EBITDA requirements were revised, Pendum could not meet the EBITDA requirements in the Third Amendment.[23] Year-end 2006 EBITDA for the company was $12.4 million—way below the minimum year-end EBITDA of $22.9 million required by the Third Amendment—and the company suffered a year-end loss of $5.7 million.[24] The balance sheet for December 31, 2006 reflected *negative* stockholder equity of about $28.7 million.[25] That is why, when Edgewater reached out to Jefferies & Company about a possible restructuring of Pendum's debt, a director of Jefferies warned Edgewater that if another "amendment doesn't get signed up, the banks will force a sale that will most likely impair the position of the 2nd lien holders and wipe out everyone below them," which included Edgewater's equity investment.[26]

Although Edgewater helped Pendum secure its Fourth Waiver and Amendment to the Credit Agreement in December 2006 (the "Fourth Amendment"), which reduced the financial milestones again, Jefferies warning made it clear to Edgewater that Pendum's lenders were weary of its unprofitable performance under Edgewater's

---

**18.** Tr. 805:24–814:11 (Tolmie).

**19.** *Id.* at 809:17–24.

**20.** *Id.*

**21.** Tr. 144:5–9 (Ozbolt) (describing Allied's business).

**22.** JX 36 (Amended and Restated Limited Guaranty) [hereinafter Limited Guaranty]; JX 24 (Agreement Regarding Letter of Credit); Pre–Tr. Stip. at 3.

**23.** JX 25 (Waiver, Consent and Third Amendment to Amended and Restated Credit Agree-

ment); Tr. 889:3–892:18 (Tolmie–Cross) (discussing the various violations of the Credit Agreement and the resulting waivers to cure the events of default).

**24.** JX 244 (ATM Acquisition Monthly Performance Analysis Ending Dec. 31, 2007); Tr. 19:4–21:4 (Hoppe).

**25.** *Id.*

**26.** JX 35 (Edgewater internal email).

control.[27] Shortly after the Fourth Amendment was ratified, Edgewater tried to shore up Pendum's balance sheet by making a capital infusion with Allied. Together, Edgewater and Allied, along with some other minor investors, invested an additional $8 million in Pendum.[28]

As it turned out, the $8 million investment, which Edgewater was convinced would solve the company's liquidity problems, was not large enough.[29] In January 2007, Pendum's largest customer, Washington Mutual, informed Pendum that it would terminate its contract on May 1, 2007.[30] Washington Mutual's termination meant that Pendum would lose its largest source of cash flow.[31]

After losing its biggest customer, realizing that the extra $8 million it raised with Allied was not enough to solve the company's financial problems, and constantly having to negotiate with its creditors for amendments and waivers to the Credit Agreement, Edgewater sized up its options, and decided to try to exit its investment just one year after the merger it had conceived.[32] Edgewater hired Financial Technology Partners ("FT Partners") to sell Pendum.[33] But FT Partners' process was unsuccessful because Pendum's auditor could not provide an unqualified going concern opinion.[34] Soon after having received a number of indications of interests in response to FT Partners' marketing, Edgewater shut the process down in July 2007 because it knew that the sale process would not survive buyers' due diligence without certified financial statements and without any plausible basis for demonstrating that Pendum could be profitable if it had to pay off the acquisition debt.[35] Edgewater realized the obvious: it is hard to sell a company as a "going concern" when you can't get a "going concern" opinion.

After Pendum triggered several more defaults and Edgewater successfully negotiated for several more waivers of those defaults, the senior creditors demanded that Edgewater submit a comprehensive, long-term solution to Pendum's financial problems. Thus, as a condition to the *Seventh* Waiver and Amendment to the Credit Agreement, the senior creditors contractually required Edgewater to submit a satisfactory re-

---

**27.** JX 37 (Waiver, Consent and Amendment to Amended and Restated Credit Agreement); JX 42 (Fourth Amendment to Credit Agreement) (providing a new EBITDA table with lower figures).

**28.** Tr. 822:10–20 (Tolmie) ("$8 million is what, through our analysis, we assessed would be required to fund the company through that continued integration program. And probably we thought, at this point, we thought the integration program would take at least another year, so it would run through that entire period of time." Q: "And did Edgewater participate in that infusion of capital?" A: "We did. We put in half of that $8 million along with Allied put in the other half.").

**29.** *Id.*

**30.** JX 47 (Letter from Vedder Price to Wells Fargo Foothill enclosing letter from Washington Mutual (Jan. 30, 2007)); Tr. 824:22–23 (Tolmie) ("And again, we had committed that much [$4 million] earlier on, but [Washington Mutual's termination] was just four days after.").

**31.** Tr. 825:2–13 (Tolmie); Tr. 14:1–13 (Hoppe).

**32.** Tr. 901:9–17 (Tolmie–Cross).

**33.** Pre–Tr. Stip. 4.

**34.** Tr. 901:18–902:3 (Tolmie–Cross).

**35.** *Id.; see also* Tr. 832:9–24 (Tolmie) (discussing why Edgewater shut down the sales process).

structuring plan in 40 days.[36] Even with this time allotted, Edgewater failed to make a proposal and thus triggered another event of default under the Credit Agreement. Edgewater attempted to negotiate a short-term solution to Pendum's problems through another waiver of default,[37] but some of the senior lenders were fed up with Edgewater's management and constant requests for accommodations, and thus began looking to sell their position in Pendum's debt, fearing that their debt investments might become valueless.[38]

Sean Ozbolt, HIG's lead officer on Pendum-related matters, learned about willing sellers of Pendum's debt from Seaport Group, a distressed debt broker.[39] On September 12, 2007, HIG purchased 39% of the first-lien debt from Wells Fargo.[40] HIG purchased Wells Fargo's debt at about 76 cents on the dollar.[41] HIG followed up with an additional 6% purchase of the first-lien debt on September 28, 2007, at about 72 cents on the dollar.[42] As a result of these purchases, HIG became Pendum's largest senior lender.

Because of Edgewater's mismanagement and failure to find a long-term solution to Pendum's capital structure, the senior lenders, which now included HIG, drew a line in the sand: the lenders would not continue to fund the company's short-term liquidity needs in a *ninth amendment* unless the Edgewater-appointed directors on Pendum's board resigned.[43] Edgewater thus had two options: buy out the senior lenders or quit; it bears keeping in mind, however, that these were Edgewater's remaining options because it had failed to propose a restructuring or find a buyer for Pendum's assets.[44] Edgewater chose to quit.[45] Edgewater's directors resigned and Edgewater then appointed experienced restructuring consultants to Pendum's board by voluntarily amending the

---

**36.** JX 77 § 7.21 (Seventh Amendment to Amended and Restated Credit Agreement) (requiring Edgewater to submit an "Acceptable Restructuring on or before September 30, 2007").

**37.** JX 95 (Email from Sean Ozbolt) (describing Edgewater's attempt to negotiate another short-term solution).

**38.** *Id.* (summarizing the reasons why the "Bank group was pissed," to use the technical term, that Edgewater asked for six additional weeks to submit a restructuring plan).

**39.** Tr. 116:1–4 (Ozbolt).

**40.** Pre–Tr. Stip. at 4; JX 90 (Purchase and Sale Agreement For Distressed Trades); Tr. 116:15–21 (Ozbolt).

**41.** Tr. 116:23–117:14 (Ozbolt).

**42.** Pre–Tr. Stip. at 4; Tr. 188:9–15 (Ozbolt–Cross).

**43.** JX 117 (Amended and Restated Term Sheet) (proposing the resignations of Edgewater's directors as a condition of the Ninth Amendment and Waiver to the Credit Agreement); Tr. 134:24–135:8 (Ozbolt) (explaining that the creditors wanted to replace the Edgewater directors with independent directors "who could evaluate the entire capital structure ... and push all parties to get a comprehensive solution....").

**44.** Tolmie Dep. 147:10–16 (Q: "I guess [instead of resigning] there was another option [that Edgewater had,] which was to buy out the lenders, right, at least in theory?" A: "In theory." Q: "As long as the lenders are repaid they don't have a right to continue to involve themselves in the operation of the Company, right?" A: "That's right.").

**45.** *See* JX 13 § 2.3(c)(i) (Pendum's Stockholders' Agreement) ("Any [Edgewater director] may be removed at any time, either with or without cause, *but only as Edgewater may determine.*") (emphasis added); Tr. 858:5–859:16 (Tolmie) (discussing the resignation of Edgewater's directors).

Stockholders' Agreement.[46]

After the Edgewater-appointed directors resigned, Edgewater was unwilling to invest more money into the company.[47] Because no one was willing to invest more money to support Pendum,[48] the lenders decided that they would either take Pendum through bankruptcy or sell its assets under Article 9 of the Uniform Commercial Code.[49] Every interested party, including Edgewater, had advised Pendum's board of directors that a bankruptcy would be a disastrous route to take.[50] But Edgewater and Allied took the position that an Article 9 foreclosure sale agreement would also produce only bad outcomes for all of Pendum's stakeholders. Instead, Edgewater and Allied advocated for an out-of-court restructuring. Although Pendum's board of directors agreed that a consensual agreement by Edgewater, Allied, and the senior lenders would be ideal, Edgewater and Allied were not willing to put up enough capital to induce the secured lenders to make a deal. Thus, Pendum's board of directors decided to negotiate with its lenders on a foreclosure sale agreement to sell Pendum's assets under Article 9.[51] Pendum, HIG, and the first-lien agent eventually signed a foreclosure sale agreement (the "Foreclosure Sale Agreement") in December 2007.[52]

46. *See* JX 126 (Amendment to Amended and Restated Stockholders' Agreement); JX 149 (Written Consent of the Stockholders) (providing Edgewater's written consent to appointing the directors from XRoads Solutions LLC and Mark Hoppe to Pendum's board); JX 119 (email from Nemeroff to Tolmie) (explaining that the Stockholders' Agreement will be amended to reflect that Edgewater's directors will resign); Tr. 212:9–16 (Ozbolt–Cross) ("We proposed that Edgewater appoint four new directors, and they accepted that proposal." Q: "And those four individuals were appointed; correct?" A: "And Edgewater appointed those four individuals, correct."); *see also* Tolmie Dep. 155:5–18 (Q: "And in signing [the Written Consent of the Stockholders], did you understand that Edgewater, as a stockholder of the Company, was consenting to the appointment of these new directors?" A: "I understood that the alternative to this was a failure of the Company and that we were left with no choice but to sign this under duress." Q: "You contend this was under duress?" A: "That's a legal term. I should back up." Q: "Well[?]" A: "It's a fiduciary—I'm sorry. Go ahead." *"My question is does Edgewater contend that this consent was signed under duress?"* A: *"No."*) (emphasis added).

47. JX 449 (Tolmie's handwritten notes) ("[Edgewater] is done putting in money"); *see also* JX 95 (Email from Sean Ozbolt describing the lenders' meeting with Edgewater) ("[N]either [Edgewater] nor Allied [are] making any commitment now to stick more money in.").

48. *Id.; see also* JX 191 (Minutes from Board Meeting (Dec. 5, 2007)) (discussing how the company has been out of cash, operating on a "day to day extension of the funding" by the senior lenders); Tr. 328:19–329:2 (Athanas–Cross) (explaining that HIG was the only lender still waiting to extend money to the company).

49. Tr. 134:3–138:1, 143:3–145:9, 152:11–153:22 (Ozbolt) (explaining why the lenders decided to negotiated a foreclosure sale agreement after the Ninth Waiver and Amendment to the Credit Agreement).

50. Tr. 51:14–52:17 (Hoppe); 153:2–7 (Ozbolt); JX 179 (email from Tolmie to Pendum Board of Directors) ("With regard to bankruptcy filing, Pendums [sic] at great peril of losing customers and quickly having the value of its assets diminished and cash flow reduced to force a liquidation. . . .").

51. JX 205(email from Dennis Simon to Allied) (responding to Allied and Edgewater's objections to the foreclosure sale process, clarifying the board's reasons for pursuing a consensual foreclosure sale with HIG, and highlighting that Allied, Edgewater, and HIG had failed to reach a consensual agreement).

52. JX 230 (Foreclosure Sale Agreement) [hereinafter FSA].

As part of the Foreclosure Sale Agreement, Pendum's board of directors negotiated for the right to hire a financial advisor to try to find a buyer for Pendum's assets by a certain date.[53] But Pendum's board of directors also agreed that if they could not find a buyer by a certain date, then HIG could proceed with a foreclosure sale auction.[54] Pendum's board of directors hired Miller Buckfire (a financial firm that specializes in advising distressed companies) to market the company for sale.[55] Miller Buckfire ran a comprehensive process: it solicited financial and strategic buyers, signed confidentiality agreements with interested parties, received indications of interest, and held management meetings with potential buyers.[56] Pendum's management worked alongside Miller Buckfire to secure a firm bid for the company's assets. But after management met with interested buyers, no one was willing to make a bid for Pendum, finding the company to be too risky of an investment.[57]

After the Miller Buckfire process ended, HIG moved forward with the auction as contemplated by the Foreclosure Sale Agreement.[58] HIG sent out notice of the auction to Edgewater, Allied, and potential buyers identified by Miller Buckfire.[59] In addition, HIG ran two advertisements in the *Wall Street Journal*.[60] On March 17, 2008, the day of the auction, only Pendum Acquisition, an affiliate of HIG, showed up and bid on Pendum's assets.[61] Thus, Pendum Acquisition purchased Pendum's assets.

After the auction, HIG discovered certain problems with the company that it had not known about as a lender.[62] To address these issues, HIG negotiated the First Amendment to the Foreclosure Sale Agreement and Transition Services Agreement with Pendum's board of directors, which enabled Pendum to transfer the assets to HIG while keeping the business intact and clarifying the liabilities HIG assumed.[63]

## III. *The Parties' Contentions*

Edgewater contends that HIG failed to comply with Article 9 of the Uniform Commercial Code. Edgewater claims that HIG's sale of assets to Pendum Acquisition (a HIG affiliate) was a private sale between two secured lenders, which is prohibited by Article 9. In the alternative, Edgewater argues that even if the foreclosure sale was public, HIG still violated Article 9 because the sale was not commercially reasonable.[64]

HIG denies Edgewater's myriad accusations about its conduct in selling Pendum's assets. HIG maintains that the foreclosure was commercially reasonable in all

53. *Id.* § 5.

54. *Id.* §§ 5, 6.

55. Tr. 62:3–13 (Hoppe).

56. JX 350 (Miller Buckfire Summary of Sale Process (Mar. 13, 2008)).

57. *Id.;* Tr. 61:12–65:6 (Hoppe) (discussing management's role in the Miller Buckfire process).

58. Tr. 167:12–16 (Ozbolt).

59. *Id.* at 167:17–168:1; Pre–Tr. Stip. at 5; JX 323 (Notice of Public Disposition of Collat-

eral); JX 349 (transcript of auction) (listing potential bidders who HIG sent a notice to about the auction).

60. Pre–Tr. Stip. at 5.

61. JX 349 (transcript of auction).

62. Tr. 172:7–173:9 (Ozbolt).

63. Tr. 322:13–323:8 (Athanas); Tr. 175:24–177:17 (Ozbolt); Tr. 78:21–80:8 (Hoppe).

64. Pls.' Pre–Tr. Br. 29.

aspects. HIG also counterclaims that Edgewater, by failing to respond to a demand for payment under the Amended and Restated Limited Guaranty (the "Limited Guaranty"), has breached its contractual obligation to pay HIG about $4 million. And because the Limited Guaranty provides for fee shifting arising out of any efforts made by the secured lenders to enforce the agreement and because HIG believes that Edgewater prosecuted its claims principally to avoid paying it, HIG argues that it is contractually entitled to its attorneys' fees, costs, and expenses associated with litigating this case.

### IV. Legal Analysis

The main issue to be resolved is if HIG violated Article 9, Part 6 of the Uniform Commercial Code.[65] Edgewater's other claims largely fail if this issue is resolved against it.

### A. Did The Defendants Violate Article 9 Of The Illinois Commercial Code?

∎ Article 9, Part 6 of the Illinois Commercial Code governs this dispute

concerning the sale of collateral by a secured lender after default.[66] Under 810 ILCS 5/9–610, a "secured party may sell ... any or all of the collateral" but "*[e]very aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable.*"[67] Whether a sale is commercially reasonable is a question for the trier of fact and must be determined on a case-by-case basis.[68]

∎ In addition to the commercial reasonableness requirement, 810 ILCS 5/9–610 restricts when a secured party may purchase the collateral:

> (c) A secured party may purchase collateral:
>
> (1) at a public disposition; or
>
> (2) at a private disposition only if the collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations.

---

65. Neither Edgewater nor HIG has been scrupulous about articulating whether Delaware or Illinois commercial law applies. Because the Security Agreement and Credit Agreement select Illinois law, I will apply Illinois commercial law in resolving this claim. See Security Agreement § 23(a); Credit Agreement § 12(a); see also J.S. Alberici Constr. Co., Inc. v. Mid–W. Conveyor Co., Inc., 750 A.2d 518, 520 (Del.2000) ("Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction.") (citation omitted); Abry P'rs V, L.P. v. F & W Acquisition LLC, 891 A.2d 1032, 1048 (Del.Ch.2006) ("Parties operating in interstate and international commerce seek, by a choice of law provision, certainty as to the rules that govern their relationship.").

66. See 810 Ill. Comp. Stat. Ann. 5/9–610 (2013); 9C Frederick H. Miller & Neil B. Cohen, Hawkland Uniform Commercial Code

Series § 9–601:1 (William Henning, Updates) (2012) ("Miller & Cohen") ("Part 6 of Article 9 [Rev] concerns the rights and duties of the parties upon default. It assumes that the secured party has an enforceable security interest.... Part 6 sets out the ground rules for resolving matters when default has occurred and the secured party ... exercise[s] his or her rights as a secured creditor. The secured party's rights after default are the very essence of a secured transaction.").

67. 810 Ill. Comp. Stat. Ann. 5/9–610 (emphasis added). See also 8 Thomas M. Quinn, Quinn's Uniform Commercial Code Commentary and Law Digest § 9–610[A][5][Rev] (Rev.2d ed. 2012) ("[W]hile the secured party's latitude on disposition is extreme, this commercial reasonableness restriction is no less extreme.").

68. Standard Bank & Trust Co. v. Callaghan, 177 Ill.App.3d 973, 127 Ill.Dec. 186, 532 N.E.2d 1015, 1019 (1988).

Thus, a secured party, subject to the commercial reasonableness requirement, may purchase its own collateral at a "public" disposition, but not a "private" disposition unless it is the kind of property with a readily identifiable market-based value.[69] Here, HIG's affiliate, Pendum Acquisition, must have purchased Pendum's assets at a public sale to avoid a violation of the statute because Pendum had no readily identifiable market-based value.[70]

Although the text of Section 5/9–610 of the Illinois Commercial Code does not address the distinction between private and public dispositions, the comments to the Section provide, in relevant part, that:

> [A] 'public disposition' is one at which the price is determined after the public has had a meaningful opportunity for competitive bidding. 'Meaningful opportunity' is meant to imply that some form

of advertisement or public notice must precede the sale (or other disposition) and that the public must have access to the sale (disposition).[71]

Thus, the comments classify a sale as public when there is some publicity and the ability for potential buyers to make a bid for the assets.

▪ Under the Illinois Commercial Code, there is some overlap between the requirement that "[e]very aspect" of a disposition of assets be "commercially reasonable" and for a "public sale" to give third parties a "meaningful opportunity" to bid for the collateral. In order for a sale to be public, there must be some efforts made to generate interest in bidding for the assets and the possibility for third parties to do so.[72] Likewise, for a sale of a company's

---

**69.** *See* 9C Miller & Cohen § 9:610:4 ("Section 9–610(c) [Rev] makes one important distinction between public and private dispositions—the secured party may always purchase the collateral at a public disposition.").

**70.** HIG makes the argument that because it set up a shell company to purchase Pendum's assets that did not own any of Pendum's debts—Pendum Acquisition—the sale of assets was not to a secured lender, and therefore, could have been a private sale. Defs.' Post-Tr. Br. 36. I reject HIG's position because it is inconsistent with the public sale requirement under the Illinois Commercial Code. Here, there is no evidence in the record that Pendum Acquisition was anything but a shell company set up specifically to acquire the assets of Pendum on behalf of the secured lender, HIG. The statute's requirement that the secured lender purchase collateral at a "public sale" (unless the asset has a readily identifiable market value) is supposed to encourage the secured lender to maximize the price received for the collateral by providing the debtor, other creditors, and third-parties with the opportunity to observe and participate in the sale process. Grant Gilmore, the primary drafter of Article 9, explained that the statute "restrict[s] the secured party's right to buy at his own sale unless it is 'public'" in hopes that "there will be that lively

concourse of bidders which will protect the secured party from his own weakness and drive the price up those Himalayan peaks of fair value and true worth." 2 Grant Gilmore, *Security Interests in Personal Property* § 44.6 at 1242 (1965). Thus, the ban on private dispositions between secured lenders aims to "protect the interest of the debtor" in receiving a high price for the collateral at a sale by giving other parties a chance to buy the assets. 9C Miller & Cohen § 9–610:4. Even for a Delaware judge, who is familiar with the importance of respecting the distinctions between different corporate entities, it is evident that a secured creditor could too easily escape the public sale requirement by setting up an entity with no assets, officers, or directors solely to bid on the collateral. For these reasons, I find that Pendum Acquisition is a "secured lender" for purposes of the foreclosure sale under the Illinois Commercial Code.

**71.** 810 Ill. Comp. Stat. Ann. 5/9–610 n. 7 (2013).

**72.** Following the guidance in the comments to Section 9–610, commentators and courts have generally concluded that a sale is public when there is an opportunity to bid and pre-sale advertising or an invitation to attend an auction is sent to interested bidders. *See* 2

assets to be commercially reasonable, there must be some marketing of the assets and the opportunity to bid on it.[73] Rather than burden the reader with sequential analyses of these related issues, I examine whether the sales process used to dispose of Pendum's assets was public and commercially reasonable in the sense that the sales process gave buyers other than HIG a meaningful opportunity to purchase Pendum's assets. In other words, to the extent that I conclude that, within the context of the economic circumstances Pendum faced, potential buyers were given a fair chance to buy Pendum's assets, then Edgewater's contentions that the sale was not public and not commercially reasonable both fail.

■ But before I address if HIG's sale process was public and commercially reasonable, I must discuss Edgewater's contention that the sale must have been private because Pendum's assets were marketed and sold under agreements negotiated by Pendum's board and HIG. Although this claim has no support in the statute, case law, or real-world circumstances facing Pendum, I find it necessary to address this argument because, when a sales process is taken out of context as it is in Edgewater's post-trial briefs, and when the collateral is ultimately sold under agreements negotiated by the secured lender and debtor as Pendum's asserts were here, it may seem, at first blush, inconsistent with the statute to conclude that the sale was "public." But that is not so for reasons I now explain.

HIG and Pendum's board entered into a Foreclosure Sale Agreement to effect the sale of Pendum's assets. As has been explained, when Edgewater controlled Pendum, the senior creditors were granted the contractual right to foreclose upon the company's assets with "10 days notice." [74] Precisely to give Pendum an *improved* and *better* chance to find a buyer other than HIG, the Pendum board negotiated the Foreclosure Sale Agreement. That agreement, as will be seen, was expressly intended to make the sales process public and commercially reasonable, by allowing Pendum to hire a qualified investment

---

Grant Gilmore, *Security Interests in Personal Property*, § 44.6 at 1242 (defining a public sale as one where "the relevant public is not only invited to attend but is also informed, by whatever means of publicity may be appropriate, when and where the sale is to be held"); Boyd J. Peterson, Annotation, *Secured Transactions: What Is "Public" or "Private" Sale Under UCC § 9–504(3)*, 60 A.L.R.4th 1012 (1988) (collecting cases discussing whether a sale is "public" or "private"); Luize E. Zubrow, *Rethinking Article 9 Remedies: Economic and Fiduciary Perspectives*, 42 UCLA L.Rev. 445, 534–35 (1994) ("Although Article 9 does not define what constitutes a 'public' sale, case law suggests that the defining characteristics are that the public is invited to appear and bid and that the goods are sold to the highest responsible bidder."); *see also* Restatement (First) of Security § 48 cmt. c (1941) (defining a public sale as one where the public is invited by advertisement to appear and bid at an auction).

**73.** *See* 810 Ill. Comp. Stat. Ann. 5/9–610(b) (2013) ("Every aspect of a disposition of collateral, *including the method, manner, time, place, and other terms*, must be commercially reasonable.") (emphasis added); 2 Grant Gilmore, *Security Interests in Personal Property*, § 44.5 at 1232–33 (discussing that commercially reasonable means that the secured lender used her "best efforts" to "advertise" and generate interest from third parties in purchasing the collateral); Boyd J. Peterson, Annotation, *Secured Transactions: What Is "Public" or "Private" Sale Under UCC § 9–504(3)* § 24[a] Business assets, inventory, or equipment, 60 A.L.R.4th 1012 (1988) (collecting cases holding a sale of business assets to be commercially reasonable).

**74.** Security Agreement § 16(a).

bank with the freedom to seek out all logical buyers and to work with Pendum's officers and directors, such as Hoppe, to get as good a deal for Pendum as they could. The Foreclosure Sale Agreement improved the sales process in a material way by giving a lead role to Pendum itself, thereby creating an open opportunity for Pendum to secure a better deal.

At the time the Foreclosure Sale was being negotiated by the parties, Pendum was hemorrhaging cash and the Foreclosure Sale Agreement was the only viable option Pendum had to avoid an immediate bankruptcy and get the capital to enable it to run a sales process.[75] Edgewater had abandoned its fiduciary status and would not fund such a process.[76] Nor would Allied or any other lender for that matter.[77] Thus, Edgewater attempts to turn HIG's efforts to include the board in the sales process, which it had no contractual obligation to do, into a negative feature of the sales process when it was manifestly a positive one.[78] Crucially, Pendum's board

of directors negotiated for a fiduciary out in the Foreclosure Sale Agreement, so that if Allied, Edgewater, or a third-party made a superior proposal before Pendum's assets were sold, the board could jettison the Foreclosure Sale Agreement and pursue a different path.[79]

■ If a court deemed a sale "private" whenever a debtor-company negotiates substantial contractual concessions from the foreclosing party in order to give the debtor *more* of a chance to find another buyer, but the secured lender ends up buying it, it would create counterproductive incentives for secured creditors exercising their rights under the Uniform Commercial Code to the detriment of debtors. Rather than encouraging secured creditors to work with debtors to give debtors a meaningful opportunity to market the collateral for sale effectively, it would encourage creditors to go it alone. In the context of selling a company, it would also be especially counterproductive

75. JX 227 (Minutes of Special Meeting of Board of Directors (Dec. 21, 2007)). The minutes of that meeting show that Robert Manzo of Capstone Advisors, a consultant hired by Pendum when Edgewater controlled the board, advised the board of directors that the Foreclosure Sale Agreement was the best option available:

> [F]rom a financial perspective, the Allied proposal had a number of litigation risks in terms of a debtor in possession priming fight, a plan confirmation fight, and operating liquidity during such a contentious process. Mr. Manzo also indicated that the HIG proposal provided an opportunity to receive additional funding to run a process that afforded other stakeholders the opportunity to participate in the process and, potentially, any upside from that process, as well as maintaining the Company's options. *Id.*

76. JX 449 (Tolmie's handwritten notes) ("[Edgewater] is done putting in money"); *see also* JX 95 (Email from Sean Ozbolt describing the lenders' meeting with Edgewater)

("[N]either [Edgewater] nor Allied [are] making any commitment now to stick more money in.").

77. Tr. 328:24–329:2 (Athanas–Cross) (explaining that "other lenders [were] not willing to make any more loans under any circumstances").

78. *See* Security Agreement § 16 ("Upon the occurrence and during the continuance of an Event of Default ... [HIG] may take immediate possession of all or any portion of the Collateral ... [and] sell the Collateral or any part thereof. ...").

79. *See* FSA § 7.4 ("Notwithstanding anything to the contrary contained in this Agreement, at any time prior to the Closing, the boards of directors of the Loan Parties may withdraw the Loan Parties' consent to this Agreement ... in order to accept an Alternative Transaction proposal if the boards of directors of the Loan Parties determine in good faith that such Alternate Transaction proposal constitutes a higher and better offer. ...").

because the debtor (the company itself) has access to confidential information and its officers and directors are also in the best position to market the company for sale, or at the very least, advise the secured lender on how to market the company. Therefore, I find that, as the Code itself intimates in the comment describing what makes a sale public, negotiated agreements between secured creditors and debtors that provide a structure for marketing an asset for sale do not necessarily make a sale private. Instead, what matters is whether the end result of whatever process the secured lenders used gave third parties a "meaningful opportunity" to bid for the collateral.[80]

It is therefore perverse and with ill grace that Edgewater argues that the HIG foreclosure sale process consisted solely of placing two advertisements in the *Wall Street Journal* and sending out a form notice to potential bidders, because HIG's actions do not encompass Miller Buckfire's efforts to sell the company.[81] To exclude the negotiated market test Pendum was able to conduct—without interference from HIG—in assessing whether HIG's foreclosure sale was commercially reasonable would have perverse results. Rather than getting credit for allowing a neutral seller to vigorously market an asset, HIG would be punished, because the court would disregard the market check ran by an independent financial advisor in determining if HIG's process was commercially reasonable. Thus, I find that each part of the

Foreclosure Sale Agreement was part of HIG's efforts to sell Pendum's assets under Article 9, and therefore, I also conclude that the Miller Buckfire process was part and parcel of HIG's efforts.

I now examine whether HIG's foreclosure sale process was public and commercially reasonable.

### 1. Was The Sale Process Commercially Reasonable In All Aspects?

■　"Every aspect" of HIG's sale process—from the signing of the Foreclosure Sale Agreement to Miller Buckfire's market check to the auction to the amendment to the Foreclosure Sale Agreement—must be "commercially reasonable." [82] Although the Illinois Commercial Code does not define the term "commercially reasonable," the comments to 810 ILCS 5/9–610 note that "Section 9–627 provides guidance for determining the circumstances under which a disposition is 'commercially reasonable.' " [83] In turn, 810 ILCS 5/9–627, titled "Determination of whether conduct was commercially reasonable," provides, in relevant part, that:

(b) Dispositions that are commercially reasonable. A disposition of collateral is made in a commercially reasonable manner if the disposition is made:

. . .

(3) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.[84]

---

**80.** 810 Ill. Stat. Ann. 5/9–610 n. 7 (2013).

**81.** *See* Post–Tr. Arg. 14–20 (arguing that HIG should not receive credit for Miller Buckfire's efforts); Pls.' Post–Tr. Br. 36 (accusing HIG of trying to "co-opt" the Miller Buckfire process to "cover up the inadequacies of HIG's own marketing efforts"); Pls.' Pre–Tr. Br. 32 (claiming that the "totality" of HIG's efforts were sending out a notice two

weeks before the auction and placing an advertisement in the *Wall Street Journal* ).

**82.** 810 Ill. Comp. Stat. Ann. 5/9–610(b) (2013).

**83.** *Id.* n. 2.

**84.** 810 Ill. Comp. Stat. Ann. 5/9–627(b) (2013); *see also* 9C Miller & Cohen § 9–627:1 ("Quite obviously, the fact that these key pro-

Thus, the statute identifies the "practices of dealers in the type of property" as the key to a secured party conducting a commercially reasonable sale. Here, then, the analysis turns on whether HIG sold Pendum's assets in conformity with the practices of a financial advisor who sells distressed entities.

Under Section 5 of the Foreclosure Sale Agreement (the "Alternative Transaction" provision), Pendum's board had the right to hire an investment banker, solicit bids for the purchase of Pendum's assets, exchange confidential information with interested buyers, and complete a transaction before February 14, 2008.[85] Because of Pendum's financial distress, HIG agreed to provide $10 million in financing that enabled the company to continue operating during the market check and paid for Pendum's financial advisor.[86] If management could not find a buyer and close a deal by February 14, 2008, HIG could hold a public auction. But the board also successfully negotiated for a fiduciary out, permitting it to consider superior transactions after February 14.[87] Thus, not only did HIG agree to the company's request to market itself for sale and consider all of its options until Pendum's assets were sold, but it agreed to allow Pendum to hire an independent financial advisor that it would pay for, which was a *concession* HIG made in the negotiations.[88]

Another reality motivated the market check run by the company's officers and directors in the Foreclosure Sale Agreement. Edgewater—which had had the chance to buy the company or the senior debt and continued to have that opportunity until the assets were sold at the foreclosure auction—was threatening litigation and unwilling to invest more money into the company. Edgewater would have questioned any sale process led by HIG. And third parties were, for obvious reasons, more likely to trust a sale process run by the company. The Foreclosure Sale Agreement thus set up a process allowing Pendum to try to find a buyer using a qualified investment banker. In that process, Mark Hoppe, who had every incentive to find a buyer as a large equity holder and as an individual with a material investment in the senior debt, worked tirelessly with Pendum's other directors to get the best deal for Pendum, given its economic circumstances, from HIG. Hoppe's

visions governing the duties of a secured party . . . utilize such a nonspecific standard is an invitation to . . . litigation as to whether the secured party complied with the standard in realizing the collateral. The purpose of revised Section 9–627[Rev] is to provide some guidelines for application of this commercial reasonableness standard."); 11 Lary Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* § 9–627:3 (3d. 2012) ("UCC § 9–627 provides a safe harbor that, by following, a secured party can be assured that a disposition will be deemed to have been conducted in a commercially reasonable manner.").

85. FSA § 5.

86. Tr. 59:6–11 (Hoppe); Tr. 307:16–20 (Athanas).

87. FSA § 7.4.

88. Tr. 158:16–159:10 (Ozbolt) (describing the negotiation of the Alternative Transaction provision); Tr. 61:18–65:6 (Hoppe) (explaining, in detail, the Alternative Transaction provision and the Miller–Buckfire sales process); *see also* Tr. 159:1–10 (Ozbolt) ("The company basically said, before we're going to allow the lenders to foreclose on the assets and agree not to stand in their way of doing that, we want to market the business for sale in a more healthy process, if you will, not at a UCC auction, but in a more typical investment-banking-run marketing auction rather than by a distressed process. And so the company wanted to hire an investment banker and go out and contact potential bidders for the assets.").

interests, it must be remembered, were aligned with Edgewater's, not only in having a desire to recover something for his equity investment in Pendum, but in his desire to sell the company at a price that would alleviate him of having HIG draw down his $1.2 million letter of credit that he had posted in support of the senior debt. Thus, Hoppe had every incentive to find a buyer who would pay a sum that would relieve him of that substantial penalty. The evidentiary record and commercial reality thus reinforce HIG's argument that allowing Pendum's directors to market the company's assets made it more likely that it would receive a firm bid at the highest price possible.[89]

Even so, Edgewater contends that the Foreclosure Sale Agreement discouraged competitive bidding by providing for an unnecessary and artificial time frame in which to market and sell the company—55 days.[90] But Edgewater, in making this argument, ignores the solvency, liquidity, leadership, and operational issues Pendum had when it entered into the Foreclosures Sale Agreement. Although Edgewater now argues that Pendum's financial condition began to improve before the Foreclosure Sale Agreement was entered into, the

evidence in the record belies this assertion.[91] In July 2007, Edgewater described the company's cash situation as "dire" and expressed concern with "the deteriorating quality of [Pendum's] earnings."[92] An Edgewater internal memorandum circulated on August 4, 2007 flagged a major cash flow problem: the company spent cash at a higher rate than it took cash in, and as a result, the company began "stretching" vendors.[93] Because Pendum continued to be unprofitable, Edgewater was advised in September 2007 "not to engage any consultant to discuss valuation."[94] The reason for this warning was telling: a valuation would likely show that Pendum was insolvent.[95] Indeed, Pendum did not have certified financial statements because it could not get an unqualified going concern opinion from its auditor.[96]

Pendum's leadership and operational issues contributed to Pendum's financial distress. A presentation from a meeting of the board of directors a couple of months before the parties began negotiating the Foreclosure Sale Agreement captured the leadership problems that plagued Pendum:

- Organizational Issues

89. HIG's expert on the Uniform Commercial Code, Mark Thomas, testified persuasively that from a buyer's perspective it is better if the company itself markets the asset for sale. *See* Tr. 567:9–568:1 (Thomas) ("And in my experience, if a secured lender tries to take over the sale process and run a sale process, the buyers, whether it's a strategic buyer who's a competitor, or financial buyers who specialize in buying distressed assets, sense desperation, sense, sort of, blood in the water and think if the secured lender is going to run the sale, I don't have to pay anything more than what they're owed. I'll make an offer that's below their debt because they're running the sale. Who else cares?" Q: "So, in your opinion, it's better for a company to run the sales process to maximize value." A: "In my experience, secured lenders don't have the ability, the expertise to run the sale of an

entity. That's not what they do. And it's better for all concerned that they not do it.").

90. Pls.' Post–Tr. Br. 38.

91. *Id.* at 10–11.

92. JX 65 (Edgewater email exchange).

93. JX 73 (Edgewater Internal Memorandum, Pendum 13 Week Cash Flow Analysis).

94. JX 88 (Edgewater internal email).

95. *Id.*

96. Tr. 901:13–17 (Tolmie–Cross) (Q: "And that's because Pendum couldn't get an unqualified opinion as to its viability as an ongoing concern; isn't that true?" A: "Yes.").

- Senior leadership has turned over three times since Efmark acquisition
- 50% turnover at branch manager level in last 12 months
- New management needs time to illustrate stability and recruit stronger second tier managers [97]

The report also identified Pendum's major operational issues:

- Operational Issues:
 - Organizational and leadership problems have created integration and service problems
 - Armored service is lacking: high turnover, branch integration problems and poor route planning has resulted in failure to meet on time delivery requirements
 - Repair and maintenance service is poor

 . . .

 - Billing conversion problems resulting in lost revenue, billing delays, and customer confusion

 . . .

 - Cash flow concerns limiting productivity and creating customer and vendor risk.[98]

Pendum's looming insolvency and operational mess explain why Pendum did not have sufficient liquidity to fund its own sales process when it entered into the Foreclosure Sale Agreement.[99] If the company had not been on the verge of bankruptcy and very low on cash, it probably could have funded its own, longer sales process.[100] But, under the real-world circumstances facing the company in December 2007, the 55–day process simply reflects that Pendum had to find a buyer quickly because it had insufficient capital to run a longer process when the Foreclosure Sale Agreement was signed.[101] Because of Pendum's insolvency, it was commercially reasonable, even generous, for Pendum to have a 55–day sales process funded by the secured lenders.

Remember, the Uniform Commercial Code requires that sale processes be commercially reasonable in the sense of being reasonable for an asset of its kind.[102] A going concern that cannot go, because it cannot pay its bills, cannot be compared to Apple, Johnson & Johnson, or DuPont, which can. A distressed—nay, in this case, basically insolvent—going concern must be sold in a commercially reasonable process that takes into account the stark reality of the company's economic facts,

97. JX 104 (Pendum Board Presentation (Sept. 26, 2007)).

98. *Id.*

99. JX 191 (Meeting of Board Meeting (Dec. 5, 2007)) (discussing how the company was out of cash and operating on a "day to day extension of the funding" by the senior lenders).

100. Mark Thomas aptly described the situation: "[I]n a perfect world, where everyone had all the liquidity they want . . . [a] longer [process], the better[.][But] in the real world facing this company, those kind of [longer] processes could not have been undertaken. . . ." Tr. 557:11–15.

101. JX 191 (Meeting of Board Meeting (Dec. 5, 2007)); *see also* Tr. 554:18–555:1 (Thomas) ("They were in default. So every dollar that they collected of their accounts receivable was collateral of the lenders. But the company couldn't survive on what we call cash collateral. In other words, its cash receipts were not sufficient to pay its cash disbursements; and, therefore, that capital support, that $10 million became critical" to the marketing process).

102. 11 Lary Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* § 9–610:5 (3d. 2012) ("The secured party's . . . sale must be appropriate to the type of collateral involved.").

not based on a false assumption that the foreclosing party must prop up the failing entity for the lengthy period that a very healthy going concern could use to test the market.[103] Edgewater's complaints and its desire to ignore Pendum's real world failure to pay its bills comes with sour irony. Having failed to buy out the creditors, sell Pendum, or otherwise fix Pendum during the period when the creditors gave Edgewater *eight* amendments and waivers to the Credit Agreement, Edgewater's attempt to act like the sale process for Pendum should have extended for a longer period inconsistent with its insolvency is entirely without commercial logic or equity.

Despite Pendum's financial distress and operational issues, Miller Buckfire ran a comprehensive process that included every step it would usually take in selling a company's assets. Richard Morgner (an investment banker with over twenty years of experience, who has sold over 20 distressed businesses, and performed many restructuring valuations and financings) testified that the Miller Buckfire team strived to "run a process with a ton of integrity," and thus worked with management to identify as many suitable buyers as possible.[104] On January 3, Miller Buckfire launched the process by contacting 67 potential buyers, which included financial and strategic buyers.[105] Edgewater has failed to identify a single logical buyer

whom Miller Buckfire failed to solicit. Not one.

After the initial round of contact, Miller Buckfire sent a teaser to 44 interested parties.[106] The teaser describes Pendum's business, the difficulties the company experienced following a merger, and the transaction structure.[107] As to the transaction structure, the teaser explained that:

> The company's senior lenders recently executed a definitive agreement to recapitalize the Company. The Company is currently soliciting higher and better offers and anticipates closing the transaction in February 2008. The Company will consider offers for the entire business, as well as separate bids for the armored and field service operations.[108]

The teaser did not mention the Foreclosure Sale Agreement. This was consistent with HIG's understanding of how Pendum wanted to market the company:

> It is our understanding that the Pendum companies want to provide notice of the sale to potential buyers without informing them that the stalking horse bid is a Foreclosure Sale Agreement or that the sale process is a foreclosure sale process. . . . [109]

In all, 36 companies signed a nondisclosure agreement with Pendum.[110] The 36 companies then received the Confidential Information Memorandum. This docu-

---

103. As a matter of reality, many healthy sellers do not want to go through a lengthy sale process. Long sale periods and fulsome due diligence do not always advantage sellers because aggressive buyers seeking advantage have compasses with the word south on them.

104. Tr. 360:8–16, 362:9–11 (Morgner); *see also* JX 261 (email from Richard Morgner to Mark Hoppe) (stating that Miller Buckfire's goal is to be as "inclusive as humanly possible").

105. JX 350 at 2 (Miller Buckfire Summary of Sale Process (Mar. 13, 2008)) [hereinafter MB Summary]; Tr. 379:9–380:3 (Morgner).

106. JX 453 (Miller Buckfire Teaser).

107. *Id.*

108. *Id.*

109. JX 187 (email from Athanas (Dec. 4, 2007)).

110. MB Summary at 8.

ment contained detailed information about the company's history, products, services, and financial performance.[112] But it made no reference to the Foreclosure Sale Agreement.[113] Miller Buckfire included a letter with the Confidential Information Memorandum requesting interested parties to make a non-binding expression of interest.[114] Miller Buckfire received 10 indications of interests in response.[115]

Miller Buckfire then invited several interested parties to participate in management presentations.[116] At these presentations, Miller Buckfire, along with key personnel from Pendum, including Mark Hoppe (interim CEO) and Kevin Rogers (CFO), spoke to potential buyers.[117] HIG was not invited to these meetings.[118] Nor did HIG participate in them.[119]

Although the original time frame was supposed to only last 55 days, the actual process lasted 83 days. When Miller Buckfire brought ten interested bidders to the table, HIG granted Miller Buckfire two extensions to go beyond the original 55–day time frame in the Foreclosure Sale Agreement.[120] Although a third extension was denied, Morgner believed that the third extension "wasn't going to make a difference," because "people had dropped their values ... significantly," the "turnaround was much more severe than [buyers] originally thought," Pendum

"wasn't on track to meet its numbers that were included in the [confidential information] memorandum," and buyers had a "general unease about some of the financial information."[121] Thus, it was Pendum's less than reliable financial reporting, operational mess, poor revenue stream, and distressed situation, not the timeframe provided for by the Foreclosure Sale Agreement, that scared bidders away.[122]

Interested buyers have tools, short of a definite acquisition agreement, to express to a seller that they are genuinely interested in purchasing a business but need more time to do due diligence. A buyer can offer stopgap financing, pay for an option, or even make some simple overture to the board to let the board know that it is serious. The denial of the third extension made sense because none of the many possible buyers Morgner contacted made any move of any kind.

At trial, Morgner in fact still appeared genuinely disappointed that he could not reel in a firm bid, but confident that he did everything possible to do so.[123] Indeed, this court has held, in *Vornado PS, LLC v. Primestone Investment Partners,* that a secured lender ran a commercially reasonable sale under the Uniform Commercial Code when it sold a business in a much

112. *Id.*

113. *Id.*

114. JX 263 (Miller Buckfire Letter) (describing to interested parties where to submit bids).

115. MB Summary at 8.

116. Tr. 389:3–12 (Morgner).

117. *Id.* at 389:19–390:2.

118. Morgner testified that his interactions with HIG were "very limited" and he only

updated them at a "relatively high level." *Id.* 395:12–396:15.

119. *Id.*

120. *Id.* at 375:6–11.

121. *Id.* at 400:20–401:4.

122. *Id.* at 399:2.

123. *Id.* at 395:12–401:19 (discussing Miller Buckfire's efforts to secure a firm bid for Pendum's assets).

shorter time frame than HIG.[124] In *Vornado*, the secured lenders sent out notice on April 18, hired an investment banker to market the company, placed advertisements in newspapers on April 22, and held an auction on April 30 (where the secured lender made the only bid).[125] In *Vornado*, potential bidders did not even have access to material non-public information about the company because the company refused to cooperate with the secured lenders.[126] But, because the "actions undertaken by [Vornado's investment banker] were consistent in all material respects with actions it has taken in the past in connection" with marketing similar securities, this court held that the foreclosure sale was conducted in a commercially reasonable manner.[127]

Unlike the three-week sales process run by the secured lender in *Vornado*, HIG consented to a 55–day process run by the company's officers and directors and the company's investment banker who had access to confidential information. I am also convinced, like the financial advisor in *Vornado*, that Miller Buckfire ran a sales process that was similar to those that it had run in other distressed scenarios. Although the sales process had a firm end date (which was in any case extended twice), Pendum's board had a fiduciary out

in case it had to consider a bid that came after the Miller Buckfire process ended.[128] Even Edgewater's expert witness testified that Miller Buckfire took the steps a reasonable financial advisor would take to sell a distressed entity.[129]

Towards the end of Miller Buckfire's process, third parties, including Edgewater and Allied, still had time to show Pendum's board that it was interested in purchasing Pendum's assets, even if they had dropped out of the process, because HIG advertised that it would hold an auction for the assets. HIG provided notice of the foreclosure sale auction to over sixty bidders identified by. Miller Buckfire as the parties most likely to make a bid for the company, including Allied and Edgewater. At HIG's request, Miller Buckfire sent bid procedures to every party that provided Miller Buckfire with an indication of interest.[131] HIG then placed two advertisements in the *Wall Street Journal.*[132] Finally, HIG held an auction that was open to potential bidders to attend.[133]

The fact that no one showed up to bid at the auction or even contacted the board about forestalling the auction to do more diligence, especially the firms that received bid procedures and had met with management, is telling.[134] The fact that Edge-

---

**124.** 821 A.2d 296, 316 (Del.Ch.2002).

**125.** *Id.*

**126.** *Id.*

**127.** *Id.; accord Pioneer Bank & Trust Co. v. Mitchell*, 126 Ill.App.3d 870, 81 Ill.Dec. 889, 467 N.E.2d 1011, 1014 (1984) (concluding that to determine if a sale was commercially reasonable, the court must look to the practices among dealers of that type of property).

**128.** Tr. 77:12–16 (Hoppe).

**129.** Tr. 501:13–17 (Miller) ("Miller Buckfire went through many if not most of the steps that I described earlier, which would constitute a reasonable process under the circum-

stances ... with respect to the property involved here.").

**131.** JX 349 (transcript of auction); *see also* JX 340 (email from Morgner to Pendum's board of directors) (informing the board of directors that Miller Buckfire sent bid procedures to the ten companies that had provided an indication of interest during the sales process at HIG's request).

**132.** JX 349 (transcript of auction).

**133.** *Id.*

**134.** *See Odyssey P'rs, L.P. v. Fleming Cos., Inc.* 735 A.2d 386, 421 (Del.Ch.1999) (rejecting the plaintiff's contention that bidding was

water never showed up to bid is more telling.[135] Edgewater failed to provide a rational explanation for why it did not attempt to bid for Pendum's assets if it actually believed Pendum was worth as much at it claims. Edgewater's main defense is that it didn't have the "powder" to make a bid.[136] Though, if the company was sure to be in the money, Edgewater should have been able to at least find a partner to make a bid for the company. After all, Edgewater touts that it can do transactions of "any size,"[137] and the investment in this case (about $40 million) seems tiny in relation to Edgewater's claims about being able to do large private equity deals (which are well into the billions).[138] Edgewater did not make a bid for Pendum's assets because it did not believe that the company was worth more than the minimum bid.

After HIG's affiliate prevailed at the auction, HIG worked with Pendum's board to close the deal. Edgewater complains that the amendment to the Foreclosure Sale Agreement and Transitions Services Agreement, negotiated after the auction, were commercially unreasonable because it shows that the auction did not really signal the end of the sale process and set the final price.[139] But this argument ignores that whoever bought Pendum's assets

chilled at an auction when the "plaintiffs [ ] adduced no evidence that any potential bidder was actually deprived of a fair chance to bid at the foreclosure sale or had any interest in bidding...."); 2 Grant Gilmore, *Security Interests in Personal Property* § 44.6 at 1245 (1965) ("If the mechanism [a public sale] ... fails to produce any bids except the secured party's a reasonable inference is that there was no value to be salvaged.").

Furthermore, there is no presumption under Illinois case law about the commercial reasonableness of an auction when only the secured lender shows up to bid as Edgewater contends. Both cases Edgewater relies on to support this commercial unreasonableness presumption stand for the proposition that a court may, but must not, infer improper notice if no one attends an auction as a matter of law. *See Voutiritsas v. Intercnty. Title Co. of Ill.*, 279 Ill.App.3d 170, 215 Ill.Dec. 773, 664 N.E.2d 170, 179 (1996); *Boender v. Chi. N. Clubhouse Ass'n Inc.*, 240 Ill.App.3d 622, 181 Ill.Dec. 134, 608 N.E.2d 207, 213 (1992). *Boender* held, and later *Voutiritsas* (quoting *Boender*) likewise held, that "[w]here no one attends the public auction except the secured creditor, improper notice of the public auction may be inferred." *Id.* Moreover, unlike the secured lenders in *Boender* and *Voutiritsas*, HIG provided notice about the auction to the parties that were most likely to make a bid for Pendum and HIG did not have any pre-arranged contracts to resell the company after the auction. Another material distinction is that the defendants in the Illinois cases did not have a financial advisor perform a

market check before the auction. Thus, I decline to infer anything about the commercial reasonableness of this transaction based on the attendees (or lack thereof) at the auction. Edgewater's position is an example of the kind of detached-from-reality-argument it makes in its post-trial briefs.

**135.** *See Venhill Ltd. P'ship v. Hillman*, 2008 WL 2270488, at *28 (Del.Ch. June 3, 2008) ("If [plaintiff] truly believed that [the distressed company] had real equity value, in the sense that it could pay off its debts and have a surplus for its stockholders, he would have been anxious to try to buy [it] ... and to take the upside for himself."); 2 Grant Gilmore, *Security Interests in Personal Property* § 44.6 at 1245 (1965) ("If [the interested party] does nothing, his later allegation that the property was worth a great deal more than the secured party paid for it should be received with great scepticism.").

**136.** Post–Tr. Arg. 21–22.

**137.** JX 310 (Edgewater's website) ("[W]e are able to fund equity investments of essentially any size.").

**138.** *See, e.g.,* Bain & Company, *Global Private Equity Report* (2012), http://www.bain.com/bainweb/pdfs/Bain_and_Company_Global_Private_Equity_Report_2012.pdf. (categorizing mid-market deals as ones valued between $500 million and $5 billion).

**139.** Pls.' Post–Tr. Br. 30.

would have to figure out a way to transition the company to new ownership.[140]

An amendment to a foreclosure sale agreement to include a transition services agreement is not uncommon in distressed scenarios, and here, it was commercially reasonable because Pendum and HIG had to deal with how to transfer licenses to the new company while keeping the business intact.[141] Additionally, I find that there is no reliable evidence in the record that suggests that the First Amendment to the Foreclosure Sale Agreement and the Transition Services Agreement were special concessions made at HIG's behest to ensure that only HIG could buy the assets.

In other words, it is likely that any other buyer would have negotiated with Pendum over certain items between signing and closing. Nothing in the record suggests that this reality—the need to address emerging issues between signing and closing—precluded any interested buyer from outbidding HIG or reflected any favoritism toward HIG. In fact, Mark Hoppe, one of Pendum's directors, testified that the board of directors negotiated for a fiduciary out in part because they knew that it would be likely that the board of directors would have to negotiate a transition services agreement with the ultimate buyer of Pendum's assets.[142]

**140.** After HIG's affiliate won the auction, it performed additional due diligence and discovered two material issues that it had not known about as a lender: (1) the company had not been paying sales tax in various states; and (2) the company did not have proper licenses to operate armored cars in a number of jurisdictions in which it currently operated. Tr. 172:7–173:9 (Ozbolt). The company's licenses in particular were a problem for HIG because the licenses could not be properly transferred to new buyers if they were invalid. And even if the licenses were valid, Pendum needed more time after the auction to assign the licenses to a new owner. Thus, to effect a smooth transition, the parties amended the Foreclosure Sale Agreement to include the Transition Services Agreement. Tr. 322:13–323:8 (Athanas); Tr. 175:24–177:17 (Ozbolt); Tr. 78:21–80:8 (Hoppe).

**141.** JX 385 (Amendment to the Foreclosure Sale Agreement). See Tr. 622:3–11 (Thomas–Cross) (explaining that when parties are under pressure to sell a company "very rapidly," there may be parts of the agreement that need adjusting after the sale is finalized, and thus companies will often amend the foreclosure sale agreement to include a transition services agreement); see also Tr. 78:21–79:7 (Hoppe) (explaining that the Foreclosure Sale Agreement was amended because it was not "crystal-clear" and didn't reflect the need for a Transition Services Agreement); Tr. 323:9–323:17 (Athanas) (Q: "Do you recall any of the issues that needed to be clarified [by the amendment]?" A: "I remember there was an employee lawsuit, and there were some

other employee liabilities, some of which the borrowers wanted to make clear were being assumed and some of which the buyer wanted to make clear were not being assumed, depending on which side of the ordinary course scale they fell on."); Tr. 174:15–175:1 (Ozbolt) (describing the amendment as a way to clarify the liabilities assumed by HIG under the Foreclosure Sale Agreement and include the Transition Services Agreement); Director Defs.' Br. Supp. Summ. J. 42 (reinforcing, in a motion for summary judgment, that "the FSA Amendment and the TSA provided benefits to the Company. The FSA Amendment required the Buyer to provide an offer of employment to all of the Company's current employees. The TSA required that the HIG Entities pay the Company's taxes, employees' salaries, and out-of-pocket expenses. Additionally, the TSA provided for the payment of $504,000 to the Company for Non–Transition Costs. These agreements were necessary to protect the jobs of the Company's employees and ensure a smooth transition of the Company's operations to the Buyer.") (citations omitted).

**142.** Tr. 78:21–79:7 (Hoppe); see also Tr. 243:24–244:15 (Ozbolt–Cross) ("[T]he rationale that the directors put forth for their fiduciary out ... [that] is if they had a real buyer who would put up a deposit or some other sign of good faith or sign of binding purchase agreement subject only to HSR, that they would need that ability to get out of the foreclosure sale agreement to sell to that buyer, and that we would most likely have some kind of a negotiation at that point.").

For all of these reasons, I harbor no doubt from the trial record that HIG's efforts, which includes Miller Buckfire's market check, conformed with the reasonable commercial practices of a financial advisor who sells businesses, giving many third parties an opportunity to purchase Pendum's assets or bid on them at the auction. Thus, I find that the sales process as a whole, starting with the Foreclosure Sale Agreement and culminating with the public auction and amendment to the Foreclosure Sale Agreement, was clearly public and commercially reasonable in all aspects.

### 2. Was The Price Paid Commercially Reasonable?

■ Even if the foreclosure sale process was commercially reasonable, Edgewater contends that the foreclosure sale was in violation of the Illinois Commercial Code because the price paid for Pendum's assets bore no relation to the value of the company.[143] The drafters of the Uniform Commercial Code recognized that the undefined term "commercially reasonable" would invite after-the-fact litigation about the secured lender's compliance with the rule, especially given the tendency of debtors to complain about the low sale price obtained by secured lenders after foreclo-

---

**143.** Edgewater's valuation expert testified that Pendum was worth $110 million on March 13, 2008. Tr. 636:7–10 (D'Souza). I did not come away persuaded. D'Souza's expert valuation report is unreliable for the following reasons. First, D'Souza relied on optimistic cash flow projections prepared by Kevin Rogers (a Pendum employee) in August 2007, which never reflected Pendum's actual cash flows, but rather were based on a "dramatic turn-around for Pendum" after a restructuring of Pendum's debt. Tr. 650:22–24 (D'Souza); Tr. 673:22–674:2 (D'Souza–Cross). That turnaround plan was never implemented. Tr. 675:22–676:16 (D'Souza–Cross). Why Edgewater's expert relied on stale, not to mention, unrealistic data when Edgewater controlled the company and had access to financial data until at least October 2007 was never properly explained. Second, D'Souza's valuation based on comparable companies fails to compare Pendum to other distressed companies. Tr. 728:1–11, 734:9–19. (Clarke). Finally, when D'Souza was confronted by some glaring mistakes he made in his original report, he submitted a revised report to the court. JX 439 (Amended Expert Report of D'Souza). Although there were material changes in the cash flow projections, there was no change in his overall conclusion about the value of the company. To my mind, this makes no sense. Nor did it make sense to HIG's expert, whose objections D'Souza was attempting to confront: "Well, the changes were fairly dramatic changes. In other words, the EBITDA multiple that Mr. D'Souza had calculated in his original report for Brink's was about 12 times, and in the revised report is about 6 times. And while I believe that that is a pretty significant change, my reading of Mr. D'Souza's report is that it did not affect his conclusion of value." Tr. 742:17–24 (Clarke).

I also find that statements made by Edgewater before trial about how to value Pendum undermine its reliance on D'Souza's report as evidence of the company's value in March 2008. Before trial, Edgewater claimed that the company was worth $130 to $150 million in March 2008 because potential bidders had sent FT Partners indications of interest in that range in June 2007. Tolmie Dep. 432:19–23 ("Our position is that the fair market value is the same as it was at the time that we received indications of value in the prior year, which was a range of 130 to 150 million or higher."). In defending this valuation methodology, Tolmie said that "real valuation comes down to what somebody is willing to pay for the company." Id. at 453:10–14. After all, Tolmie explained, a company's value is "not some multiple of EBITDA analysis.... That's not the real world.... [V]aluation methodologies employed by third-party valuation analysts ... typically don't really reflect the real world." Id. at 539:21–612:11. If Edgewater could have sold Pendum for $130–150 million or even much lower in 2007, *it would have done so.* As discussed, it could not because the company's poor performance prevented it from getting a going concern opinion and surviving buyer's due diligence.

sure sales.[144] To ameliorate some of the difficulties of complying with such a non-specific standard, 810 ILCS Section 5/9–627 provides, in relevant part, that:

> (a) Greater amount obtainable under other circumstances; no preclusion of commercial reasonableness. The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner.

Most important, this subsection states that the possibility of obtaining a higher price is "no preclusion of commercial reasonableness."[145] The comments to 810 ILCS Section 5/9–627 reinforce that the purchase price after a foreclosure sale is not an outcome-determinative factor: "[a low price is] not itself sufficient to establish a violation of this Part."[146] Instead, a low price "suggests that a court should scrutinize carefully all aspects of a disposition to ensure that each aspect was commercially reasonable."[147]

■■■ Edgewater does not make any connection between the statutory text and its assertion that HIG formally establish the fair value of the company for the sale to be commercially reasonable. Under Illinois law, "the fundamental rule of statutory interpretation is to give effect to the intention of the legislature."[148] To do so, courts must "give statutory language its plain and ordinary meaning, and, where the language is clear and unambiguous, [a court] must apply the statute without resort to further aids of statutory construction."[149] The plain language of 810 ILCS 5/9–624 does not instruct the court to look at the "fair value" of the transaction.[150]

---

144.　9C Miller & Cohen § 9–627:1.

145.　810 Ill. Comp. Stat. Ann. 5/9–627(a) (2013).

146.　*Id.* at n.2.

147.　*Id.; see also* 11 Lary Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* § 9–627:4 (3d. 2012) ("No matter how commercially reasonable were the actions of the secured party in disposing of the collateral it is often happenstance whether the disposition will obtain the highest amount that could be obtained for the collateral. The reason for not having obtained the highest price possible may be as simple as the person who would have paid the highest price being sick that day. [Rev] UCC § 9–627 recognizes the randomness inherent in whether a disposition is successful in obtaining a good price for collateral.... In other words, a low price is not conclusive as to whether a disposition was conducted in a commercially reasonable manner.").

148.　*County of Knox ex rel. Masterson v. Highlands, LLC*, 188 Ill.2d 546, 243 Ill.Dec. 224, 723 N.E.2d 256, 263 (1999).

149.　*Town & Country Utils., Inc. v. Ill. Pollution Control Bd.*, 225 Ill.2d 103, 310 Ill.Dec. 416, 866 N.E.2d 227, 235 (2007).

150.　*See Volini v. Dubas*, 245 Ill.App.3d 846, 184 Ill.Dec. 703, 613 N.E.2d 1295, 1302 (1993) ("While price is the key component in assessing commercial reasonableness, price alone does not establish commercial reasonableness. It is well established that property does not bring its full value at forced sales. This principle is reflected by the Code itself....") (citations omitted); *Nat'l Boulevard Bank of Chi. v. Jackson*, 92 Ill.App.3d 928, 48 Ill.Dec. 327, 416 N.E.2d 358, 361 (1981) ("[T]he price element alone does not establish the commercial reasonableness of a sale.... This court has held that mere inadequacy of price in the absence of fraud, mistaken or illegal practice does not vitiate the sale.") (citations omitted); *Chi. City Bank & Trust Co. v. Wilson*, 86 Ill.App.3d 452, 41 Ill.Dec. 466, 407 N.E.2d 964, 968 (1980) ("The court implicitly required plaintiff to establish the commercial reasonableness of the price received and found that the price received was not commercially reasonable. This placed an

Rather, the statutory language compels the court to determine if HIG sold the assets in "conformity with reasonable commercial practices among dealers in the type of property."[151] As I have explored at length above, every aspect of this sale was in conformity with the reasonable commercial practices of financial advisors who sell distressed companies. Because the sale of Pendum's assets was in conformity with the reasonable commercial practices of financial advisors who sell distressed entities, I conclude that the price was commercially reasonable too.[152] Pendum's poor performance and operational mess under Edgewater's own leadership translated into the value Pendum's assets received at the auction, which was confirmed by the market check.[153]

3. *Did HIG Make Commercially Reasonable Efforts To Maximize The Price Received For Pendum's Assets?*

▇▇ Edgewater's contention that the price paid at the auction reflects that HIG made no effort to run a sales process that maximized price lacks merit and is inconsistent with the wide market check HIG conducted and the failure of either Edgewater or Allied to bid, both before HIG assumed control of the senior debt and after it foreclosed. I find that the $41 million minimum bid, together with the assumption of $50 million in liabilities, was the result of a good-faith and contextually reasonable negotiation between HIG and Pendum's board to reach a fair sale price and part of a larger transaction structure to maximize Pendum's final sale price.

In these negotiations, Mark Hoppe was a guarantor of fairness because he had skin in the game as large equity holder and had posted a $1.2 million letter of credit in support of the senior debt. Thus, Hoppe had every incentive to find a third-party buyer for Pendum's assets, or if one could not be found, to maximize the price of the sale at the foreclosure auction. Furthermore, the fact that Hoppe had no material ties to HIG and HIG drew down Hoppe's $1.2 million letter of credit after the auction further demonstrates that Hoppe did not have an incentive to color his fact testimony in HIG's favor. Therefore, I consider Hoppe's testimony about the value of the deal to be highly reliable.

Hoppe testified that the board's goal was to get a minimum floor bid worth about $100 million (including liabilities) and felt strongly that the minimum bid at $41 million, which was worth about $92 million (including liabilities), was fair.[154] He also explained that the purchase price dropped from $56 million to $41 million near the end of the negotiations because HIG agreed to assume a number of additional liabilities, the most of important of which were Pendum's employment contracts.[155] When Hoppe was asked how

---

additional burden on plaintiff and one which the aforementioned cases do not require.").

**151.** 810 Ill. Comp. Ann. Stat. 5/9–627(b)(3) (2013).

**152.** *See In re Excello Press, Inc.*, 890 F.2d 896, 904–05 (7th Cir.1989) (applying Illinois law and holding that "[t]he product of a commercially reasonable sale *is* the fair market value. If the secured party can prove that the sale was commercially reasonable, it has proved the market value of the collateral."); *see also*

9C Miller & Cohen § 9–627:4 n. 2 ("[I]f a sale is considered commercially reasonable, then price is reasonable.").

**153.** *See* 2 Grant Gilmore, *Security Interests in Personal Property* § 44.6 at 1245 (1965) ("As the best way to produce a fair price, the Code relies on the mechanism of a public sale, notification and publicity.").

**154.** Tr. 59:24–60:8 (Hoppe).

**155.** *Id.*

much he would pay on March 13, 2008 for Pendum's assets, Hoppe testified that based on his knowledge of the company's performance and operations that he "would not have paid [$]20 million for" Pendum.[156] Thus, I conclude that the price paid by Pendum Acquisition for Pendum's assets was not low.

Other evidence of the commercial reasonableness of the price paid by Pendum Acquisition comes from statements made by Edgewater about Pendum's value. In December 2006, recognizing the poor performance of the combined companies, Tolmie asked Hoppe for a rebate on the Efmark purchase.[157] Tolmie wrote:

> At the time of the EFMARK acquisition the valuation of the combined Company was approximately $170 million (combined $24 mil TTM EBITDA at a 7.1 multiple). As noted above, that valuation is now closer to $90 million. The negative impact on all shareholders is enormous and this situation is no less than ugly. The request for rolling 10% ($9 million) of the Efmark purchase price back into the Company as common shares represents a small piece of the pain being felt by the rest of the investor group. With a lot of hard work and luck over the next few years it's possible that this $9 million will have value. For everyone's sake, I hope that's the case.[158]

The evidence in the record reflects that Pendum's value only deteriorated after Tolmie pegged the company's value at $90 million. For instance, Edgewater tried to exit its investment by running a sales process shortly after Tolmie made his pitch to Hoppe for more money.[159] Edgewater's attempt to sell the company just a year after the merger bespeaks of Edgewater's little faith in Pendum's upside in 2007.[160] Additionally, HIG bought Pendum's debt at about 76 cents on the dollar in September 2007 and at a steeper discount in November.[161] By early 2008, HIG was able to buy Pendum's debt at about 50 cents on the dollar.[162] Allied's public filings also show that the company's value deteriorated over the course of 2007. In June 2007, Allied wrote down the value of its investment in Pendum by 50%;[163] in September 2007, *it wrote down its entire investment.*[164] Thus, Tolmie's valuation at

---

156. *Id.* at 76:22–77:3.

157. *Id.* at 22:4–7 ("Dave Tolmie had come to my office and I guess asked for a refund or a rebate on the purchase price, saying that he had overpaid for my company. . . .").

158. JX 32 (email from David Tolmie with prior email string and attachment). Later Tolmie, while defending his opinion that the company was worth anywhere between $130 and $150 million in March 2008, claimed that he offered Hoppe a "bargain" price for the investment because the company was actually worth around $150 million in December 2006. Tolmie Dep. 518:10–520:19. I find this explanation to be absurd because the email said the company's "situation is no less than ugly" and because I find it unlikely that Hoppe, who had inside information about the company's operations and performance, would reject a deal that valued the company

at $90 million if the company was actually worth about $150 million. Rather, I find that this email accurately reflects Tolmie's assessment of the company's value in December 2006.

159. Pre–Tr. Stip. 4.

160. Indeed, Tolmie testified that an early exit of an investment would be about "as quick as *two years.*" Tr. 777:16–19 (Tolmie) (emphasis added).

161. Tr. 116:23–117:14, 145:7–15, 146:17–21 (Ozbolt).

162. *Id.* at 166:14–167:11.

163. JX 74.

164. JX 154.

about $90 million more than a year before the auction, which was performed before the company slid into further financial distress and operational disarray, clearly supports that Pendum's final purchase price plus the assumed liabilities ($92 million) was a fair price for the minimum bid.[165]

Although the minimum bid was ultimately the only bid made at the open auction, the minimum bid, which was an idea that the Pendum board (including Hoppe) itself supported, was part of a larger transaction structure designed to get the highest price possible for Pendum's assets.[166] In addition to setting a minimum floor price, the Foreclosure Sale Agreement contained a provision, which the Pendum board itself demanded, that required Pendum Acquisition (the stalking horse bidder) to "increase its bid at Auction to the minimum amount necessary to constitute the highest and best bid" unless a competing bid was greater than "the amount of the Obligations outstanding as of the date of the Auction plus the assumption of the Assumed liabilities" (i.e. the Mandatory Overbid).[167] Essentially, in the event of a competing bid, Pendum Acquisition was contractually obligated to raise its bid up to $92 million. By demanding this concession from HIG, Pendum's board sought to encourage a lively auction above the first-lien debt.[168]

Edgewater disputes the reasonableness of the Mandatory Overbid, arguing that it chilled competitive bidding supposedly by requiring a third party's first bid to be more than $92 million. But I reject this contention for several reasons. First, there is no evidence in the record that potential bidders were aware of the provision.[169] Second, Allied specifically asked Pendum's board of directors to assure them that HIG had not asked them for a waiver of the Mandatory Overbid provision.[170] This inquiry provides evidence that the company's second-lien lender, who had the most to gain in an auction that fetched a price above $92 million, considered the mandatory overbid to be an im-

---

165. *See Highfields Capital, Ltd. v. AXA Fin., Inc.*, 939 A.2d 34, 42 (Del.Ch.2007) ("[A] transaction price forged in the crucible of objective market reality ... [is] strong evidence that the price is fair.").

166. JX 187 (email from Athanas (Dec. 4, 2007)) ("[B]oth parties want a[HIG] affiliate buyer ... and the Pendum companies to execute a stalking horse bid ... binding on all parties thereto subject only to higher and better bids."); Tr. 293:15–23 (Athanas) (detailing the purpose of the stalking horse bid).

167. FSA § 6.3.

168. Tr. 60:23–11 (Hoppe); Tr. 160:11–13 (Ozbolt); Tr. 294:21–295:3 (Athanas).

169. Edgewater argues that there is circumstantial evidence that bidders were aware of the mandatory overbid because the ten parties interested in making a bid received bid procedures that referenced the Foreclosure Sale Agreement. Letter from Peter B. Ladig to the Court, C.A. No. 3601–CS (Dec. 6, 2012). Although the bid procedures mentioned the Foreclosure Sale Agreement, it was only in reference to the stalking horse bid, not the Mandatory Overbid. Moreover, the Mandatory Overbid was not mentioned in the teaser (JX 453), Miller Buckfire's letter soliciting preliminary indications of interest (JX 263), management presentations (JX 462), the February 22, 2008 Notice of Public Disposition (JX 311), the February 29 Notice of Public Disposition (JX 323), the *Wall Street Journal* advertisements (JX 349, at HIG208130–31), or the Bid Procedures (JX 340). Morgner testified that the main problems with getting bidders to make a firm bid was the lack of integrity in the financial reporting of the company and the depth of the company's operational, liquidity, and solvency issues. Tr. 391:13–399:2. Thus, the weight of the evidence does not suggest that the Mandatory Overbid was viewed by anyone, and therefore, it cannot have chilled bids.

170. JX 324 (email from Allied to Pendum's Board of Directors).

portant part of the Foreclosure Sale Agreement. Third, HIG was opposed to including the provision in the Foreclosure Sale Agreement because HIG would not be able to sell its investment at a profit, but for less than the par value of the first-lien debt, having bought the debt at substantial discounts to par.[171] Finally, although the Mandatory Overbid might have discouraged some bidders if they had been made aware of it, it bears keeping in mind that the Uniform Commercial Code distinguishes "between a commercially reasonable disposition or collection and the best possible disposition or collection determined with the benefit of hindsight." [172] Here, the evidence demonstrates that Pendum's directors made a reasonable, good faith choice to demand to include the Mandatory Overbid provision in the Foreclosure Sale Agreement in an attempt to push a lively auction at dollar values above the first-lien debt.

What Edgewater also tries to obscure is that the board in part negotiated for the Mandatory Overbid with Edgewater in mind. Because Edgewater had a pro-rata interest in the final sale price as a participant in the senior debt, Edgewater would receive more money for any final sale price above the minimum bid. Thus, Edgewater itself had a rational incentive to bid at the auction for an amount above the minimum bid, but less than the amount Pendum Acquisition was contractually obligated to bid up to. If Edgewater believed that the company was worth more than Pendum Acquisition's bid, it should have made a bid up to that amount, knowing that even if it did not win the auction, it would increase its return on its investment in the senior debt. I do not find credible Edgewater's contention that it believed that it could not

make "good faith" bids for anything above $41 million (the minimum bid), but less than $92 million (the amount of obligations outstanding plus the assumed liabilities), *if it was in fact willing to pay that price.*[173] More likely, Edgewater didn't bid because it was aware that HIG might just say to Pendum, please waive the Mandatory Overbid and give the company back to Edgewater, and let us take a low-risk, nice return on our debt purchase. Edgewater's failure to ever make an offer before the Foreclosure Sale Agreement or after, or attempt to play let's make a deal, reflected its actual view that the assets were not worth as much as Pendum Acquisition's bid.

\* \* \*

In sum, I find that the foreclosure sale process was public and commercially reasonable in all aspects. HIG marketed the assets in conformity with the reasonable commercial practices of a financial advisor who sells distressed companies, creating a meaningful opportunity for third parties, including Edgewater, to bid for Pendum's assets. The Amendment to the Foreclosure Sale Agreement and the Transition Services Agreement were commercially reasonable in light of the need to finalize the foreclosure sale while keeping the business intact. And the material provisions in the Foreclosure Sale Agreement— the Alternative Transaction, the Minimum Bid, and the Mandatory Overbid—created a structure that was reasonably designed to get the highest price possible for the assets and included a bid that reflected Pendum's value on the date of the auction.

For all of these reasons, HIG is entitled to the declaration that the foreclosure sale

171. Tr. 164:21–165:7 (Ozbolt); Post–Tr. Arg. 39–40.

172. 9C Miller & Cohen § 9–627:4.

173. Tr. 963:23–964:2 (Tolmie–Cross); Post– Tr. Arg. 35.

was conducted in a commercially reasonable manner, and therefore, I find for the defendants on Count VI.

## B. *Edgewater's Other Affirmative Claims*

Edgewater has adopted an aggressive litigation posture and has sought relief from HIG based on theories of fraudulent transfer, breach of fiduciary duty, and tortious interference with contract. I now turn to resolving those claims.

### 1. *Did HIG Violate The Delaware Fraudulent Transfer Act?*

Edgewater seeks to hold HIG liable for "subjective" fraudulent transfer under 6 *Del. C.* § 1304(a)(1) and "constructive" fraudulent transfer under 6 *Del. C.* § 1305 of the Delaware Uniform Fraudulent Transfer Act.[174] Edgewater claims that HIG transferred Pendum's assets to an affiliate at the lowest possible price, which reduced the amount of proceeds it received from the foreclosure sale as a participant in Pendum's senior and junior debt. Edgewater claims that HIG's intent, in transferring the assets under the Foreclosure Sale Agreement, was to defraud Edgewater.[175]

 Edgewater's claims must fail because a sale for value after an open market check does not constitute a fraudu-lent conveyance.[176] Nor has Edgewater provided any evidence that HIG had the intent to defraud Edgewater or any other creditor in selling Pendum's assets under the Foreclosure Sale Agreement. Finally, I also note that Edgewater's claim must fail for another reason. Because a "transfer" is the disposing of the "property of the debtor" that is *not* "encumbered by a valid lien," HIG did not make a "transfer" under the Foreclosure Sale Agreement that is within the scope of the Delaware Uniform Fraudulent Transfer Act.[177] I therefore find for the defendants on Counts IV and V.

### 2. *Edgewater's Fiduciary Duty Claims*

 Edgewater claims that HIG owed it fiduciary duties because HIG had *de facto* control of Pendum. In Delaware, a party alleging that a creditor owes fiduciary duties to the company's stockholders must show that the creditor exerted control over a majority of a company's board of directors,[178] because a controlled director is not an independent director.[179] "Control over individual directors is established by facts demonstrating that 'through personal or other relationships the directors are beholden to the controlling person.'"[180] My review of the record, including the demeanor of the witnesses at

174. *See* 6 *Del. C.* § 1301 *et seq.*

175. Pls.' Post–Tr. Br. 43–45.

176. *See* 11 Lary Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* § 9–610:3 (3d. 2012) ("The 'good faith' requirements of [the] UCC ... are applicable to Article 9.... [But] Article 9[Rev] goes beyond that, by imposing a higher standard-commercial reasonableness.") (citation omitted).

177. *See* 6 *Del. C.* § 1301(2), (3), (12).

178. *Odyssey P'rs L.P. v. Fleming Cos., Inc.,* 735 A.2d 386, 407 (Del.Ch.1999); *see also In re Kids Creek P'rs, L.P.,* 200 B.R. 996, 1015–16 (Bankr.N.D.Ill.1996) (explaining that a credi-tor "undertakes the fiduciary obligations of the directors" if it takes "de facto control" by "usurping the power of the debtor's directors and officers to make business decisions.")

179. *See In re MAXXAM, Inc.,* 659 A.2d 760, 773 (Del.Ch.1995) ("To be considered independent, a director must not be dominated or otherwise controlled by an individual or entity interested in the transaction.") (citation omitted).

180. *Odyssey P'rs,* 735 A.2d at 407 (quoting *Aronson v. Lewis,* 473 A.2d 805, 815 (Del. 1984)).

trial, convinces me that the board was not dominated or controlled by HIG.

Edgewater's argument is that HIG "hand-picked" Dennis Simon, Alexander Stevenson, Chris Davino, and J.G. Ball (collectively, the "XRoads Directors") to "flush through" the sale of Pendum's assets to HIG.[181] Specifically, Edgewater claims that because HIG sought out a consulting agreement with XRoads Solutions LLC, recommended that the company appoint the XRoads directors, and provided the XRoads directors with broad indemnity, the XRoads directors were incapable of making decisions without being influenced by HIG.[182]

Edgewater's contentions are belied by the evidence in the record. First, HIG's recommendation that Pendum appoint the XRoads directors does not materially support Edgewater's *de facto* control argument. Our Supreme Court has long recognized that the manner in which someone is nominated to the board is not evidence of their lack of independence.[183] *More importantly, only Edgewater had the authority to remove its directors*[184] *and Edgewater itself voluntarily amended the Stockholders' Agreement to appoint the XRoads directors to the board.*[185] Thus, it comes with little grace for Edgewater to claim that HIG, who was not a stockholder and had no power under the Stockholders' Agreement to appoint or remove any directors, "selected" the XRoads directors and "imposed [them] on the stockholders."[186]

Second, the fact that the XRoads directors worked for a company that had a consulting agreement with HIG does not illustrate that HIG controlled the XRoads directors.[187] But Edgewater suggests that

181. Pls.' Post–Tr. Br. 45–48; Post–Tr. Arg. 22.

182. *Id.*

183. *Aronson,* 473 A.2d at 816 ("[I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director. It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence.").

184. *See* § 2.3(c)(i) (Pendum's Stockholders' Agreement) ("Any [Edgewater director] may be removed at any time, either with or without cause, *but only as Edgewater may determine.*") (emphasis added).

185. *See* JX 126 (Amendment to Amended and Restated Stockholders' Agreement); JX 149 (Written Consent of the Stockholders) (providing Edgewater's written consent to designate the XRoads directors and Mark Hoppe as the directors of Pendum); *see also* JX 138 (email from Michael Nemeroff) ("[T]he four new directors proposed by HIG–Paloma are turnaround professionals with XRoads Solutions Group. This is for your consideration as these will be the directors who you will be asked to nominate and elect.").

186. Pls.' Post–Tr. Br. 47. Tolmie in fact contradicted Edgewater's assertion when he admitted that Edgewater gave its consent to the appointment of the XRoads directors in his deposition. *See* Tolmie Dep. 155:5–18 (Q: "My question is does Edgewater contend that this consent was signed under duress?" A: "No."). Nor did HIG have the power to remove the XRoads directors once they were appointed by Edgewater and the other stockholders. *See* JX 126 § 2(c) (Amendment to Amended and Restated Stockholders' Agreement) ("None of the four directors listed in Section 2.3(a)(i)-(iv) [i.e. the XRoads directors] may be removed from the Board or any Sub Board, either with or without cause, without the prior written consent of such director."). Therefore, it is clear that Edgewater *voluntarily* appointed the XRoads directors to the board, who did not serve at HIG's pleasure.

187. *See Odyssey P'rs,* 735 A.2d at 408 (finding that a director's consulting agreement with the secured lender was not material evidence of any lack of independence).

the consulting agreement is material in this case because XRoads wanted to "cement" a relationship with HIG in Miami.[188] But Edgewater failed to adduce any evidence that suggests that the XRoads directors acted in a conciliatory manner towards HIG or to prove ultimately that there was in fact any material relationship between HIG and XRoads Solutions LLC that would cause the XRoads directors to be beholden to HIG.[189]

In fact, the evidence in the record demonstrates that the XRoads directors acted independently of HIG and consistently with advancing the best interests of Pendum.[190] At the outset of the negotiations between HIG and Pendum's board of directors (the very first day in fact), when Pendum was in default and out of cash, the board of directors pushed back against HIG's attempt to use the company's looming insolvency and general financial distress as a means to leverage a better deal for HIG. The board of directors, in responding to HIG's initial term sheet, told HIG that "[Pendum] and its Board and advisors are ready, willing, and able to engage in a concerted, good faith dialogue with you and your client" but HIG must

"extend the existing financing arrangement" to allow "the Board to make an informed decision concerning the Term Sheet."[191] Moreover, an email several days later sent by Chris Davino, an XRoad director, advised the other directors that "[w]e had a call [with] HIG and their advisors. They appear to [be] rolling over on everything we have asked them for in the term sheet. . . . We have made it clear that the Board is committing to nothing in the event that they do not agree with our process/timesheet."[192] Furthermore, Hoppe, who was the only director that testified at trial and who had a strong incentive to maximize Pendum's sale value, said, without hesitation, that he viewed the XRoads directors as hardworking and independent.[193] Hoppe and the XRoads directors worked together to advance Pendum's interests. Every material agreement in the foreclosure sale process emerges as the product of good-faith, contextually reasonable negotiation with the XRoads directors and Hoppe.

Edgewater's argument that HIG's promise to indemnify the XRoads directors caused them to be beholden to HIG does

---

188. JX 120 (email from Pete Ball to Chris Davino) (discussing XRoads Solutions LLC business prospects with HIG in Miami).

189. *See, e.g.,* JX 175 (email from the board of directors) (pushing back on HIG by telling them that its initial "Term Sheet is not anyone's best interest" and emphasizing that "the Board needs to and will exercise its [fiduciary] duties" in negotiating with HIG); JX 182 (Pendum Board of Directors email exchange) (celebrating the fact that HIG "appear[s] to [be] rolling over on everything we have asked for in the term sheet" and relating that "[w]e have made it clear that the Board is committing to nothing in the event that they do [not] agree with our process/termsheet," and remaining open to considering an "Allied DIP package in parallel."); JX 248 (internal HIG email) ("They hired [M]iller [B]uckfire—we lost on fee. . . . [H]e then made the second

point that [D]ennis [S]imon said no f'ing way is [HIG] (either as purchaser or the lender) going to dictate to a seller and its board who to hire to run its sale process . . . .").

190. *See, e.g.,* JX 145 (XRoads internal email) ("[HIG] get[s] it and also understand[s] our fiduciary duties aren't only running to them."); JX 173 (internal Pendum Board email with attachment) (comparing and contrasting the Allied and HIG proposals to determine the best course forward).

191. JX 175 (Pendum's response to HIG's draft term sheet).

192. JX 182.

193. Tr. 45:16–46:15 (Hoppe) (describing what it was like to work with the XRoads directors).

not convince me. Ozbolt testified that although it was unusual for a creditor to provide indemnity to a debtor company's board of directors, he understood why the directors made this atypical request.[194] He explained that the directors negotiated for broad indemnification because of the contentious disputes between Allied, Edgewater, and HIG.[195] Indeed, both Allied and Edgewater accused the XRoads directors of essentially being HIG's puppets before the Foreclosure Sale Agreement was finalized.[196] Thus, the directors were aware that if they approved an agreement with HIG, that agreement would likely be challenged by another party.[197] And the directors' fears in turn convinced HIG that the indemnification was appropriate.[198] Furthermore, the directors convinced HIG to indemnify them even if HIG's affiliate was not the ultimate buyer.[199] This caveat to the indemnity agreement undermines Edgewater's accusation that the indemnity incentivized the directors to favor HIG over other parties in the sales process.[200] Edgewater has thus failed to illustrate that any of Pendum's directors were controlled by HIG, or, as important, to prove any violation of their fiduciary duties of loyalty or care.

Moreover, HIG did not exert *de facto* control over the company because it had the contractual right to make decisions about when to extend further credit to Pendum when the company was in default. Under Section 8 of the Credit Agreement, which Edgewater itself negotiated on behalf of Pendum, if the company was in default, HIG had the right to:

> (a) Declare all or any portion of the Obligations ... by any of the other

**194.** Tr. 205:24–206:5 (Ozbolt–Cross).

**195.** Tr. 469:13–470:8 (Ozbolt):

> We had a lot of conversations around the accommodation and the extent of the accommodation. I think from the directors' standpoint, they would look at the—trying to come up with a consensual solution among all the parties including Allied and the stockholders and the minority shareholders. They recognized that they were getting pushback from a subset of that group, particularly the stockholders in the Edgewater funds, that there may be a lawsuit or litigation. And particularly, the XRoads Solutions directors were working for whatever consulting fee they were getting paid but had no economic stake in the business. I believe they were, you know, concerned about being sued for tens of millions of dollars if not more. And they were—I'm not sure if the company had a D & O policy in place. I just think that they were concerned about their personal liability in the event that there was extensive litigation against them.
> *See also* JX 179 (email from Edgewater to board) (voicing opposition to an Article 9 foreclosure sale); JX 171 (email from Capstone to Edgewater, Allied, and HIG) (encouraging the parties to negotiate "a reasonable

solution to what has been to date a difficult restructuring").

**196.** *See* JX 228 (email from Allied to Pendum's Board of Directors) ("[I] want you to know that my belief is that you have acted not as independent fiduciary representing the company....."); JX 196 (email from Allied to Pendum's Board of Directors) ("[A]lthough you sit in a board seat portend [sic] to be board members your actions look and smell like a group of people who are agents of HIG"); JX 180 (email exchange between counsel for Edgewater and HIG) (bickering about the independence of the XRoads directors).

**197.** *See* Tr. 44:2–8 (Hoppe) (testifying that he thought Edgewater took actions "against" Pendum during the foreclosure sales process to "set this whole [litigation] matter up"); *see also* Tr. 469:11–471:19 (Ozbolt) (testifying about threatening emails received by HIG from Allied theorizing that the XRoads directors were HIG's cronies).

**198.** Tr. 469:13–470:8 (Ozbolt).

**199.** JX 233.

**200.** Pls.' Post–Tr. Br. 47.

Loan Documents ... immediately due and payable;

(b) *Cease advancing money or extending credit to or for the benefit of the Borrowers under this Agreement ... or under any other agreement between Borrowers and the Lender Group*

(c) Terminate this Agreement and any of the Other Loan Documents ... without affecting any of the [Lender]'s liens in the Collateral and without affecting the Obligations

. . . .[201]

Because HIG had the contractual right to cease funding when Pendum was in default, Pendum's officers reached out to HIG to see if it would extend credit to the company for certain expenses when the company was in default.[202] But HIG did not have, nor did it attempt to exercise, the "ability to dictate which invoice could or couldn't be paid," because HIG understood that "[l]enders don't have the right to manage the operations of the company."[203] Even with HIG's contractual right to make the decision to cease funding, HIG still did not have "control" over the company in any sense of the word, because, as I have discussed at length, the contemporaneous evidence in the record about HIG's negotiations with the board demonstrates that Pendum's board stood its ground and extracted material concessions from HIG

in negotiations over the Foreclosure Sale Agreement. It is a matter of commercial reality that a company struggling to make financial ends meet, and in violation of a credit agreement for the *tenth* time, will have to deal with its creditors when it has expenses that need to be paid, if neither the creditor nor the company wants to force an immediate bankruptcy.[204] HIG's relative generosity as a lender does not illustrate that it exerted control over the company's operations.

For all of these reasons, I conclude that HIG did not exert *de facto* control over the company, and therefore, did not owe Edgewater fiduciary duties.[205] But even if HIG owed Edgewater fiduciary duties of loyalty and care, I would still find that Edgewater has failed to demonstrate that HIG breached those duties by "the sale of [Pendum] to itself at an under-market price."[206] Edgewater has failed to submit any persuasive evidence to the court demonstrating that the price was the product of unfair self-dealing. Moreover, the sale between affiliates at a public auction is authorized by Uniform Commercial Code. Edgewater failed to identify any potential buyer that did not have an opportunity to bid for Pendum's assets. And I have already found that the sale was commercially reasonable in all aspects and that the price was not low. Therefore, I find that Edgewater has failed to show that HIG breached the duties of loyalty and care.

---

201. Credit Agreement § 8 (emphasis added).

202. Tr. 148:18–149:5 (Ozbolt); Defs.' Post–Tr. Br. 30–31 (clarifying that only when the company was "[l]long in default on its debt, [Pendum] depended upon advances from the First Lien Lenders to maintain operations.").

203. Tr. 148:18–149:5 (Ozbolt).

204. Even if HIG had substantial bargaining power because of its contractual rights under the Credit Agreement, that leverage does not materially support Edgewater's argument that HIG had *de facto* controlled Pendum. *See In*

*Re Kids Creek P'rs, L.P.*, 200 B.R. 996, 1016 (Bankr.N.D.Ill.1996) ("Control does not exist simply because bargaining power was greatly skewed in favor of the lender because this will invariably be true wherever a debtor's primary lender is on the verge of terminating debtor's operations.").

205. *See Odyssey P'rs L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 407 (Del.Ch.1999).

206. Pls.' Post–Tr. Br. 48.

I also find that Edgewater has failed to demonstrate that the XRoads directors breached their fiduciary duties of loyalty and care. As I have already discussed, there is no credible evidence in the record illustrating that the XRoads directors were beholden to HIG. I likewise concluded that Pendum's board, including the XRoads directors, engaged in good-faith, contextually reasonable negotiations with HIG in reaching the material agreements in this case.

Although Edgewater does not press the matter in its post-trial brief, HIG cannot be liable for aiding and abetting the XRoads directors' breach of fiduciary duty when there is no underlying fiduciary breach.[207] Thus, I find for HIG on Edgewater's aiding and abetting claim.

Therefore, I find in favor of the defendants on Counts I, II, and III.

### 3. *Is HIG Liable For Tortious Interference With Edgewater's Contracts With Pendum?*

■ Under Delaware law, a claim of tortious interference with contractual relations consists of five elements: "(1) a valid contract; (2) about which defendants knew; (3) an intentional act that is a significant factor in causing the breach of such contract; (4) without justification; (5) which causes injury."[208] In its post-trial

brief, Edgewater makes the vague claim that HIG caused the company to breach the "negative covenants" of the Stockholders' Agreement by "entering into, and eventually selling the Company's assets pursuant to, the [Foreclosure Sale Agreement]," without citing to a single provision of the Stockholders' Agreement.[209]

To the extent that this court can discern Edgewater's position, it is possible that Edgewater claims that there has been a breach of one or more of the sixteen negative covenants in Section 4.6 of the Stockholders' Agreement. Each covenant provided that the company must have Edgewater's written consent before it took a certain action.[210] Apparently, Edgewater seeks to have the court sift through the myriad subsections in Section 4.6 and determine whether or not Edgewater's consent was required for the company to enter into the Foreclosure Sale Agreement. In other words, Edgewater throws this claim up without attempting to explain how the company breached the Stockholders' Agreement.

■ In the Court of Chancery, the "general rule ... that a party waives any argument it fails properly to raise shows deference to fundamental fairness and the common sense notion that, to defend a claim ... the adverse party deserves sufficient notice of the claim...."[211] Because

---

**207.** *See Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del.2001) ("[T]he four elements of an aiding and abetting claim [are]: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach.") (citations omitted).

**208.** *Beard Research, Inc. v. Kates,* 8 A.3d 573, 605 (Del.Ch.2010), *aff'd sub nom. ASDI, Inc. v. Beard Research, Inc.,* 11 A.3d 749 (Del. 2010).

**209.** Pls.' Post–Tr. Br. 48.

**210.** *See* JX 13 §§ 4.6(a)-(p) (Pendum's Stockholders' Agreement).

**211.** *PharmAthene, Inc. v. SIGA Techs., Inc.,* 2011 WL 6392906, at *2 (Del.Ch. Dec. 16, 2011); *see also Roca v. E.I. duPont de Nemours & Co., Inc.,* 842 A.2d 1238, 1243 n. 12 (Del.2004) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.... *It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work....* Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to

Edgewater has failed to attempt to explain how the company breached the Stockholders' Agreement and because Edgewater has not even cited to a relevant subsection that supports a breach of contract claim, it has waived its tortious interference with contract claim. It would be inequitable to hold HIG accountable for breaches of the Stockholders' Agreement that Edgewater failed to articulate.

■ But Edgewater may have preserved its argument as to one subsection. In Edgewater's answering pre-trial brief, it claims that Pendum breached Section 4.6(d) of the Stockholders' Agreement.[212] Section 4.6(d) required the company to obtain Edgewater's written consent before it "[e]nter[ed] into any agreement providing for the sale of all or substantially all of the Company's assets...." Edgewater claims that the company breached this provision of the Stockholders' Agreement by entering into the Foreclosure Sale Agreement.[213]

This is an exceedingly odd claim because, if there was a breach of the Stockholders' Agreement, it occurred when Edgewater agreed to provide Pendum's senior lenders with the right to sell the assets after default.[214] Under the Security and Credit Agreements, which Edgewater itself negotiated on behalf of Pendum and which were executed on the same day as the Stockholders' Agreement, the senior lenders had the right to "take immediate possession" of the company's assets and "sell" them with only "10 days notice" if Pendum triggered an event of default.[215] By granting the secured lenders the right to foreclose on and sell Pendum's assets, it

was Edgewater itself that caused Pendum to cede control of the assets to HIG. And, under Section 4.5(d) of the Stockholders' Agreement, the stockholders had a reciprocal right that prohibited Edgewater from entering into "any agreement providing for the sale of all or substantially all of the Company's assets" without the consent of a majority of the stockholders. Because Edgewater caused Pendum to enter into an agreement providing for a sale of substantially all of Pendum's assets in 10 days, Edgewater's claim fails for the obvious reason that, if any party breached the Stockholders' Agreement, it was Edgewater itself. In any event, given Edgewater's large equity stake and control of Pendum's board, it is clear that it already gave the required consent to a foreclosure sale when it caused Pendum to enter into the Security and Credit Agreements. Therefore, Edgewater cannot fairly argue that it did not approve granting the secured lenders the right to force a sale upon an uncured default.

Edgewater's suggestion that Pendum's board violated the Stockholders' Agreement by negotiating for better terms with the senior lenders therefore lacks any basis in law or equity. Once the commitment to the secured lenders had been made and the secured lenders had foreclosed on Pendum's assets under the Security Agreement, the Stockholders' Agreement became irrelevant as to a sale resulting from an event of default under the Credit and Security Agreements. The Foreclosure Sale Agreement was negotiated in light of the senior lender's Edgewater-granted contractual right to foreclose on and sell

spell out its arguments squarely and distinctly, or else forever hold its peace.") (citation omitted) (emphasis added).

**212.** Pls.' Ans. Pre–Tr. Br. 30–31.

**213.** *Id.*

**214.** *See* Security Agreement § 16; Credit Agreement § 7.

**215.** *Id.*

the company's assets in 10 days. Thus, the only remaining issue at the time that Pendum's board negotiated and signed the Foreclosure Sale Agreement was *how* the foreclosure sales process would occur, not *whether* the assets would be sold. Pendum's board, by persuading HIG to negotiate with it, received material concessions from HIG that gave Pendum a more favorable selling process. It is therefore inelegant for Edgewater to suggest that the company was required to receive Edgewater's consent (again) in order to enter into a foreclosure sale agreement that provided the company with better terms than the ones in the Security Agreement that Edgewater had negotiated and approved. Nonetheless, consistent with its aggressive litigation posture, Edgewater decided to press this claim along with every other claim it could think of.

Edgewater's prosecution of this claim also illustrates, once again, its propensity to take litigation positions inconsistent with its own actual beliefs. Edgewater's counsel, Vedder Price, who has represented it at all relevant times, including at trial, had advised Edgewater that the Stockholders' Agreement provided it with no power to stop the senior lenders from foreclosing on and selling Pendum's assets.[216] Furthermore, Edgewater's Uni-

form Commercial Code claim is also based on the theory that HIG had the contractual right to foreclose upon Pendum's assets and sell them, but failed to do so in a commercially reasonable manner.[217] For these reasons, I find for the defendants on Count VII.

\* \* \*

In sum, I find that Edgewater has failed to prevail on a single claim for relief. I therefore also conclude that Edgewater is not entitled to the additional equitable relief it requests from the court in Count IX (equitable subordination of HIG's first-lien debt).

## C. *Is HIG Entitled To Judgment In Its Favor On Its Counterclaim For Payment Under The Limited Guaranty?*

In July 2006, when Edgewater, on Pendum's behalf, went to Pendum's creditors to negotiate a third waiver and amendment to the Credit Agreement, the lenders required Edgewater to guarantee about $4 million of the senior debt.[218] Under that Limited Guaranty, Edgewater "irrevocably and unconditionally" guaranteed the payment of the "Maximum Principal Amount" when it "became due and payable." [219]

On June 25, 2008, HIG sent a notice to Edgewater demanding "full and prompt

---

216. *See* JX 208 (email from Edgewater's outside counsel, Michael Nemeroff, to Tolmie) ("In keeping with our recent conversations, attached is our internal memo that was recently updated on blocking and veto rights in the Pendum–ATM transaction. These veto rights would be difficult to enforce in a bankruptcy *and would not be applicable to foreclosures, but they would apply to a pure sales process with no foreclosure or bankruptcy.*").

217. *See* 810 Ill. Comp. Stat. Ann. 5/9–610 (2013); Miller & Cohen § 9–601:1 ("Part 6 of Article 9 [Rev] concerns the rights and duties of the parties upon default. It assumes that the secured party has an enforceable security interest.... Part 6 sets out the ground rules

for resolving matters when default has occurred and the secured party ... exercise[s] his or her rights as a secured creditor. The secured party's rights after default are the very essence of a secured transaction."); *id.* at § 9:610:3 ("Section 9–610(b) gives the secured party considerable flexibility in the disposition of collateral.... Only one limitation is placed on the secured party's choices with respect to the disposition—every aspect ... must be commercially reasonable.").

218. JX 36 (Amended and Restated Limited Guaranty) [hereinafter Limited Guaranty]; Pre–Tr. Stip. at 3; Tr. 811:18–23 (Tolmie).

219. Limited Guaranty §§ 2, 6.

payment pursuant to Section 6 of the [Limited] Guaranty" as a result of an "Event of Default ... under the Credit Agreement." [220] Edgewater never responded to the Demand Notice.[221] Instead, Edgewater has refused to pay until its claims were adjudicated.[222] Because I ruled against Edgewater on all of its claims, Edgewater must pay HIG the amount it owes under the Limited Guaranty.

Section 6 of the Limited Guaranty, which addresses Edgewater's maximum liability, states that:

> *Maximum Liability of Guarantor.* Notwithstanding any other provision of this Guaranty, the liability of Guarantor under this Guaranty shall not exceed the total of (a) *Five Million Five Hundred Seventy-two Thousand and No/100 Dollars ($5,572,000) for the principal amount of the Indebtedness (the "Maximum Principal Amount"); provided, that (i) the Maximum Principal Amount shall reduce to Four Million Seventy–Two Thousand and No/100 Dollars ($4,072,000) upon the consummation of the Allied Restructuring* (as defined in the Fourth Amendment) that would make available funds sufficient to satisfy Borrowers' cash needs and (ii) prior to the consummation of the Acceptable Restructuring, the Maximum Principal Amount shall be reduced by (I) the amount of cash collateral granted after the date hereof by the common shareholders of Holdings to secure the Obligations and (II) the face amount of letters of credit issued after the date

hereof in favor of Agent on behalf of common shareholders of Holdings, in each case to the extent in form and substance satisfactory to Agent and Lenders; *provided, further, that, the Maximum Principal Amount shall not be reduced pursuant to this clause (ii) to less than Four Million Seventy–Two Thousand and No/100 Dollars ($4,072,-000), (b) all interest on such part of the Indebtedness as shall not exceed the Maximum Principal Amount, (c) attorneys' fees, costs and expenses as provided herein,* together with fees, indemnity payments and other payments owed under the Credit Agreement (other than principal and interest) in amounts proportionate to the portion of the Indebtedness guarantied hereunder.[223]

Section 6 of the Limited Guaranty provides that the Guarantor's maximum liability is the sum of three parts: "(a) the 'Maximum Principal Amount' "; "(b) all interest on such part of the Indebtedness as shall not exceed the Maximum Principal Amount"; and "(c) attorneys' fees, costs, and expenses...." [224] As to the Maximum Principal Amount owed, HIG admits that it owes Edgewater $2.2 million from the foreclosure sale.[225] HIG also admits that it set off that $2.2 million against the $4 million Edgewater owes it under the Limited Guaranty.[226] Thus, in terms of the principal amount owed, HIG is entitled to recover only the remaining amount, about $1.8 million.

 But HIG also maintains that it is entitled to interest on the principal amount

220. JX 389.

221. Defs.' Post–Tr. Br. 48.

222. Pls.' Post–Tr. Br. 49.

223. Limited Guaranty § 6 (emphasis added in italics).

224. *Id.*

225. Tr. 263:1–264:8 (Ozbolt–Cross).

226. *Id.*

owed.[227] Edgewater, on the other hand, contends that even if the "Court enters judgment in HIG's favor on its Counterclaim, *$1,800,000 is the limit on liability.*"[228] Edgewater's conclusory assertion is not accompanied by reasoning that explains why the Limited Guaranty caps its liability to the principal amount owed. Although Edgewater does not set forth its reasoning, its argument necessarily implies that HIG is not entitled to collect interest on that amount.

HIG has the better interpretation of the Limited Guaranty; the Maximum Principal Amount is not Edgewater's "limit on liability." Section 6(b) specifically carves out interest as a component of the Guarantor's maximum liability. Thus, the contracting parties recognized that if the Guarantor breached its obligation to pay, the lenders would not be made whole unless their recovery included the principal amount plus interest.

▮▮▮▮▮ Therefore, I find that HIG is entitled to interest on the principal amount owed to it under Section 6(b) of the Limited Guaranty. As to the amount of interest owed, "a court of equity has broad discretion, subject to principles of fairness, in fixing the rate to be applied."[229] Given the sophistication of the financial parties involved in this dispute and Edgewater's attempt to use this litigation to avoid paying on the Limited Guaranty, this is an appropriate case to award compound interest.[230] I therefore grant interest at the statutory rate, compounded quarterly, on the $1.8 million due to HIG on June 25, 2008.[231]

Therefore I find in favor of the HIG on Count I of the Counterclaim.

## V. *Attorneys' Fees, Costs, and Expenses*

▮▮▮▮ Under Section 16 of the Limited Guaranty, Edgewater agreed to:

> [P]ay, on demand, all attorneys fees and all others costs and expenses which may be incurred by Agent or the Lender Group in connection with the enforcement of this Guaranty or in any way arising out of, or consequential to, the protection, assertion, or enforcement of the Guarantied Obligations (or any security therefor), irrespective of whether suit is brought.

Because Edgewater has refused to pay HIG and litigated the issue instead, HIG argues that it "has been forced to litigate this case for years now in order to recover on the Limited Guaranty."[232] HIG urges this court to find that the Limited Guaranty requires Edgewater to reimburse HIG's attorneys' fees, expenses, and costs, including the costs and expenses related to indemnifying Pendum's directors, because HIG believes that all of Edgewater's claims were a frivolous attempt to avoid

**227.** *See* Defs.' Mot. Summ. J. 46–47; Defs.' Opening Pre–Tr. Br. 48–49; Defs.' Ans. Pre–Tr. Br. 31; Tr. 180:11–18 (Ozbolt); Defs.' Opening Post–Tr. Br. 48.

**228.** Pls.' Pre–Tr. Br. 49–50 (emphasis added).

**229.** *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 409 (Del.1988).

**230.** *See Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 173 (Del.2002) ("The Court of Chancery has noted that, in Delaware, 'no rule of simple interest exists in the General Corporation Law' and '[t]he rule or practice of awarding simple interest, in this day and age, has nothing to commend it-except that it has always been done that way in the past.' We agree, and even before this appeal, we recognized the discretion of the Court of Chancery to award compound interest.") (citations omitted).

**231.** 6 *Del. C.* § 2301; JX 389 (HIG's Demand for Payment).

**232.** Defs.' Post–Tr. Br. 50.

paying the amount it owed under the Limited Guaranty.[233] Edgewater denies that the fee shifting provision in the Limited Guaranty can be read as broadly as HIG contends.[234] Edgewater maintains that under no circumstances is HIG entitled to recover all of the attorneys' fees, costs, and expenses related to this litigation.[235]

The Limited Guaranty's fee shifting provision is very broad. Under the Limited Guaranty, Edgewater agreed to pay "all attorneys fees and all other costs and expenses" HIG "may" incur "in connection with the enforcement of this Guaranty *or in any way arising out of, or consequential to, the protection, assertion, or enforcement of the Guarantied Obligations....*"[236] Edgewater has refused to pay HIG the amount it owes under the Limited Guaranty because Edgewater maintains that the Article 9 sale was commercially unreasonable, HIG fraudulently conveyed Pendum's assets to itself, interfered with Edgewater's contracts, and breached its duties of loyalty and care. Because the Limited Guaranty shifts fees that "in any way aris[es]" out of the enforcement of the amount owed by Edgewater, I find that Edgewater is liable to pay for "all" attorneys' fees, costs, and expenses associated with defending against Edgewater's affirmative claims and seeking payment on the Limited Guaranty under Count I of the Counterclaim.

Edgewater's primary motivation for this litigation was to exert leverage over HIG in hopes that HIG would walk away from demanding payment under the Limited Guaranty. In late November 2007, Edgewater was determined to oppose the foreclosure sale process (even before it knew what the terms would be).[237] Before Allied entered into a settlement agreement with HIG, Allied told Edgewater that it wanted "to strategize on the best way to make an out of court sale a problematic approach" for HIG.[238] In January, Edgewater spoke to Allied about a side-letter to implement a "jump the board strategy."[239] The deal eventually faltered when Edgewater refused to enter into a side deal without indemnification from Allied.[240] But this evidence reinforces that Edgewater, even before the Foreclosure Sale Agreement was signed, was grasping to save its investment by trying to stop HIG from asserting its contractual rights under the Credit and Security Agreements.

Even after the Allied side-deal collapsed, Edgewater tried to use the litigation system to stop HIG from foreclosing and collecting payment under the Limited Guaranty because Edgewater decided it was "done putting in money" into Pendum.[241] Rather than invest more money

233. *Id.*

234. Pls.' Post–Tr. Br. 49–50.

235. *Id.*

236. Limited Guaranty § 16 (emphasis added).

237. JX 179 (email from Edgewater to Pendum's board of directors) (raising objections to an Article 9 foreclosure sale).

238. JX 189 (email from Allied to Tolmie).

239. JX 271 (internal Allied email).

240. JX 270 (email notifying Edgewater that Allied cannot execute the side-letter).

241. JX 449 (Tolmie's handwritten notes). At trial, Tolmie tried to cabin the interpretation of his handwritten notes. Tolmie testified that his notes did not mean Edgewater was done putting money in Pendum, but rather that that Edgewater would not put in more money into Pendum until Allied did, because it was Allied's "turn to put in money." Tr. 847:16–20 (Tolmie). I find this testimony to be confusing (Edgewater never clearly explained what it meant by it was Allied's "turn" to put in more money because Edgewater never produced any record showing that it had any understanding with Allied about further Pendum investments) and inconsistent with its excuse for why it did not

into Pendum in an attempt to save its investment by taking back control of the company, on January 11, 2008, Tolmie's notes indicated that Edgewater's strategy would be to "derail the foreclosure process by HIG." [242] Several days later, Edgewater put this plan in motion. Edgewater contacted FT Partners to tell them about the Miller Buckfire process.[243] Tolmie's notes also indicate that having FT Partners interfere with Miller Buckfire would be a way for Edgewater to "gum up the works." [244] Furthermore, Edgewater sent HIG a complaint prepared by Vedder Price objecting to the "fraudulent" foreclosure sale process in March 2008.[245] In response, John Bolduc, a managing director of HIG, wrote to Edgewater's officers and asked them what modifications to the sales process they would like to see.[246] In reply, Edgewater's counsel told Bolduc that his letter was not responsive to Edgewater's settlement demands and that it only wanted to "discuss a settlement along the lines of what we discussed yesterday...." [247] Tolmie's notes from two days earlier reveal that Edgewater wanted: "(1) [To] get equity in Newco in exchange for [Edgewater's] preferred equity; *(2) release of letter of credit and fund guaranty from senior lenders and Term B lenders;* (3) participate in Term B settlement pari passu with Allied; (4) full information rights...." [248] Notably, Tolmie did not contemplate any revisions to the foreclosure sale process, but rather, wanted Edgewater to get out of paying HIG an additional $4 million it owed under the Limited Guaranty. This is telling because it shows that Edgewater was not concerned about the foreclosure sale process as much as it was about saving its own investment without incurring any additional costs.

Indeed, Hoppe's dealings with Edgewater led him to harbor the reasonable belief that Edgewater worked "against" the foreclosure sale process because it wanted to "set this whole matter up." [249] In a last ditch effort to stop the foreclosure sale process, Edgewater moved for a temporary restraining order to prevent the auction from taking place.[250] But this court denied Edgewater's request, making a preliminary finding that Edgewater had brought the motion because it did not want "to go deeper into the hole," and highlighting that if Edgewater thought the compa-

---

show up and bid at the auction: that it literally could not invest more in Pendum. *See, e.g.,* Tr. 867:22–868:8 (Tolmie) ("We already had $40 million invested in [Pendum] from the fund, which was well in excess of the 15 percent limit."); Pls.' Post–Tr. Br. 24 (explaining the "limitations on Edgewater's continuing ability to invest"); Post–Tr. Arg. 23–24 (discussing how Edgewater had never made an investment that was larger than $41 million and that Edgewater could not go materially beyond that threshold). Thus, I do not find credible Tolmie's attempt to "explain" the meaning of his notes, and instead I conclude that Edgewater made the decision that it was "done putting money" into Pendum after its final $5 million investment in August 2007.

242. JX 256 (Tolmie's handwritten notes).

243. JX 265 (email from Edgewater to FT Partners).

244. JX 445 (Tolmie's handwritten notes).

245. JX 338 (email exchange between Chris Davino and Mark Hoppe (Mar. 6, 2008)) (referencing complaint prepared by Vedder Price).

246. JX 335 (letter from Bolduc to Tolmie).

247. JX 337 (email from Nemeroff to Athanas).

248. JX 328 (emphasis added).

249. Tr. 44:2–8 (Hoppe).

250. JX 346 (Tr. Ruling Mot. for TRO (Mar. 12, 2008)).

ny had value, it should show up at the auction and bid for the assets.[251] Edgewater never showed up to bid. Although Edgewater now complains about the final sale price, Edgewater has provided no credible evidence that Pendum was worth more than HIG paid, and the contemporaneous evidence reinforces that Edgewater believed Pendum was not worth more than HIG paid.

Because the Limited Guaranty shifts all attorneys' fees, costs and expenses HIG "may" incur "in connection with the enforcement of this Guaranty or *in any way arising out of, or consequential to, the protection, assertion, or enforcement of the Guarantied Obligations,*" and because I conclude that Edgewater prosecuted its claims in an attempt to exert leverage over HIG to drop its demand for payment under the Limited Guaranty, I find that HIG is entitled to collect on all of its attorneys' fees, costs, and expenses associated with defending against all of Edgewater's affirmative claims.[252] Successfully defending these claims was necessary for HIG to collect on the guaranty, because, as Edgewater itself admits, it has refused to make payment under the Limited Guaranty until these claims were adjudicated. Likewise, HIG is entitled to collect on all of its attorneys' fees, costs, and expenses associated with prosecuting its Counterclaim.

■ But the Limited Guaranty, fairly read, does not encompass the indemnity HIG agreed to provide to Pendum's directors or the $500,000 HIG agreed to reimburse Allied in connection with "other litigation."[253] The Limited Guaranty shifts attorneys' fees, costs, and expenses "in connection" with the enforcement of the guaranty. The directors and Allied were not parties to the Limited Guaranty and have no stake in enforcing the Limited Guaranty. Moreover, HIG agreed to provide indemnity to the directors and Allied before this litigation began, and thus before Edgewater denied that it had to pay HIG under the Limited Guaranty. For these reasons, I conclude that there is no basis under the Limited Guaranty to shift these attorneys' fees, costs, and expenses to Edgewater.

Under these circumstances, I need not address HIG's request for fee shifting under the bad faith exception to the American Rule. When there is no need to make a finding of bad faith, I see no basis to do so. My decision not to reach the issue should not be construed as a ruling that fee shifting would not be appropriate under that theory. There is plenty of plausibility, regrettably, to the notion that Edgewater made this litigation unduly expensive and advanced factual theories inconsistent with its own understanding of reality. HIG's contention that Edgewater was using the costly nature of civil litigation to force HIG to concede its economic demands for nonmeritorious reasons has plenty of apparent color.

\* \* \*

As relief, HIG shall submit an implementing final judgment, upon notice as to form, within 20 days. To facilitate resolving all issues, HIG's counsel shall submit an affidavit to Edgewater within 5 days, detailing the amount of fees and expenses counsel deems reasonable and providing a summary of the hours and categories of expenses. If Edgewater has no objection as to the reasonableness of those fees and

---

251. *Id.*

252. Limited Guaranty § 16 (emphasis added).

253. Tr. 251:20–252:3 (Ozbolt).

expenses, the parties shall incorporate that figure into the final judgment they present. If Edgewater wishes to object to the fees and expenses sought, it shall file an affidavit within 5 days of its receipt of HIG's affidavit, identifying with specificity its objections. If HIG's fees and expenses are in the same range as Edgewater's, counsel shall be careful to explain why there is an objection, given that it seems plain that it would be more costly to clean up all the pizza thrown by Edgewater than to throw it. Delaware counsel for Edgewater and lead non-Delaware counsel for Edgewater shall each file an affidavit stating the reasons each believes that there is a good faith basis to dispute the reasonableness of HIG's fees and expenses, in light of Edgewater's own fees and expenses and its proliferation of claims. If such affidavits are filed, the parties shall discuss an expedited briefing schedule to resolve the dispute and shall establish what, if any, discovery should precede such briefing. To the extent that Edgewater wishes to have discovery, any request it makes of HIG will be accompanied by its own acknowledgement that it will produce the equivalent discovery to HIG regarding its own fees and expenses. To date, the parties have been unable to resolve much, if anything, without motion practice. Perhaps on this subject, they might set a new tone.